**GRAND RIVER DAM AUTHORITY,**
a body corporate, Appellant,

v.

**NATIONAL GYPSUM COMPANY,**
a corporation, Appellee.

**No. 8063.**

United States Court of Appeals
Tenth Circuit.

Oct. 6, 1965.

Rehearing Denied Nov. 16, 1965.

James R. Ryan, Tulsa, Okl. (Q. B. Boydstun, Vinita, Okl., Horace D. Ballaine, Hess Crossland, and Conner, Winters, Randolph & Ballaine, Tulsa, Okl., were with him on the brief), for appellant.

Remington Rogers, Tulsa, Okl. (Rogers, Donovan & Rogers, Tulsa, Okl., were with him on the brief), for appellee.

Before PHILLIPS, LEWIS and BREITENSTEIN, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

National Gypsum Company [1] brought this action against Grand River Dam Authority [2] to recover excess charges alleged to have been paid under duress by National to the Authority for water and steam furnished National by the Au-

1. Hereinafter called National.

2. Hereinafter called the Authority.

thority under the written contract referred to hereinafter. Both parties moved for a summary judgment. From a summary judgment in favor of National, the Authority has appealed.

The Authority is a conservation and reclamation district created by the Oklahoma Legislature in 1935 to provide flood control and to store, preserve and distribute "the waters of the Grand River and its tributaries for irrigation, power and other useful purposes, the reclamation and irrigation of arid, semi-arid, and other lands needing irrigation, and the conservation and development of the forests, water and hydro-electric power of the State of Oklahoma." (Session Laws of 1935, Chapter 70, Article 4, § 1, 82 Okl.St.Ann. § 861)

The contract above referred to was entered into between the Authority and National on November 6, 1950, and in part here material provides:

"Whereas, the Consumer [National] plans to locate, construct, maintain, and operate an industrial plant or plants upon and/or adjacent to the Authority's Chouteau Steam Plant property at the Oklahoma Ordinance Works near Pryor in Mayes County, Oklahoma; and

"Whereas, the Consumer will require for use in operating and maintaining said plant or plants electric power and energy, processed steam, raw and treated water, compressed air, and certain sanitation facilities; and

"Whereas, the Authority is able and can furnish to the Consumer its requirements of electric power and energy, processed steam, raw and treated water, compressed air and certain sanitation facilities;

\* \* \* \* \* \*

"Article I

Electric Power and Energy

"Service

1. The Authority shall sell and deliver to the Consumer, and the Consumer shall purchase and receive from the Authority electric power \* \* \* all in accordance with the terms and conditions of this Contract.

\* \* \* \* \* \*

"Rates

8. The Consumer agrees to pay the Authority monthly, each month during the period of this Contract for power and electric energy, in accordance with the following schedule of rates:

\* \* \* \* \* \*

"Article II

Water

"Service

1. The Authority shall sell and deliver to the Consumer the Consumer's requirements of (1) treated water \* \* \* and (2) raw water \* \* \*.

\* \* \* \* \* \*

"Rates

3. Consumer agrees to pay the Authority \* \* \* for water in accordance with the following schedules of rates:

\* \* \* \* \* \*

"Article III

Steam

"Service

1. The Authority shall sell and deliver to the Consumer and the Consumer shall purchase and receive from the Authority the Consumer's requirements of dry saturated steam \* \* \*.

\* \* \* \* \* \*

"Rates

3. The Consumer agrees to pay the Authority monthly each month during the period of this Contract for said dry saturated steam at the rate of 20¢ per thousand pounds of steam delivered in accordance with Consumer's requirements provided no monthly bill for dry saturated steam shall be less than $2,500.00.

"Article IV

Compressed Air

"Service

1. The Authority shall sell and deliver to the Consumer, and the

Consumer shall purchase and receive from the Authority the Consumer's requirements of compressed air * * *.

* * * * * *

"Rates

3. The Consumer agrees to pay the Authority monthly each month during the period of this Contract for said compressed air at the rate of 3¢ per thousand cubic feet of free air.

* * * * * *

"Article VI

General

* * * * * *

"Term of Agreement

9. This contract shall become effective on the complete execution of the same and shall continue from this effective date for a period of twenty-five (25) years. It will thereafter remain in effect until cancelled by two (2) years' written notice by either party. * * * Nothing herein contained shall be construed as limiting the rights of modification or termination at any time as specified in the contract. It is further understood that each of the services under this contract shall be contingent upon the erection by consumer of the industrial plant hereinbefore described and shall begin on the dates required by the Consumer for its production operations.

* * * * * *

"Most Favored Consumer Clause

14. The Authority shall give the Consumer notice of, and shall give the Consumer the benefit of, any lower rate schedules and/or more favorable terms and/or more favorable conditions of purchase made available to any of its other industrial customers of the same class at any time during the terms of this agreement."

The contract provides that the schedule of electric rates and charges set forth in the contract may be changed by the Authority from time to time but that such rates and charges shall at all times be reasonable and nondiscriminatory and shall be adequate but not in excess of what might be necessary to fulfill the obligations imposed upon the Authority by the Act under which it was created. The contract contains no provision for changing the rates for water, steam and compressed air and under the provisions of the contract the charges therefor were to remain unchanged during the life of the contract.

By resolution adopted January 5, 1960, the Authority increased its rates for electric power, steam and water to be effective April 1, 1960. Such resolution in part provided:

"Whereas, Section 7.10 of the Indenture, entered into between the Authority and the Marine Midland Trust Company of New York, as Trustee, dated as of October 1, 1948, as follows:

" 'The Authority covenants that it will, * * * prepare, adopt and file with the Trustee * * * a schedule of rates, tolls, rents and other charges for electrical energy and for any and all other commodities, services and facilities to be furnished or supplied by the Authority from the System, which are fair, reasonable and nondiscriminatory, and which are calculated on the basis of all available estimates (and with due allowance for contingencies) to yield funds at least sufficient:

" '(a) To meet the requirements of Article IV with respect to the amount from time to time to be set aside in each of the special funds provided for in Article IV; and

" '(b) To meet all other obligations of the Authority hereunder or otherwise.' "

National was advised by the Authority of such rate changes applicable to it and National thereafter paid such increased rates on water and steam under protest.

By resolution adopted April 20, 1964, the Authority again increased its rates for electric power, water and steam to be

effective July 1, 1964. That resolution in part provided:

"Whereas, Section 8.1 C of the Grand River Dam Authority's Bond Resolution No. 4010 creating and establishing an issue of $50,000,000 in Revenue Bonds, adopted December 5, 1961, is as follows:

" 'The Authority shall fix, establish, maintain and collect rates and charges for electric power and energy and other services, facilities and commodities sold, furnished or supplied through the facilities of the system, which shall be fair and non-discriminatory and adequate to provide the Authority with revenues sufficient to pay the costs of the proper operation, maintenance and repair of the System, and also for the payment of all costs, expenses and charges specified in paragraph B above, and any and all other amounts which the Authority may now or hereafter become obligated to pay or set aside from said revenues by law or contract.' "

The Authority advised National of the last-mentioned change in rates applicable to it and National thereafter paid the increased rates for water and steam under protest.

On September 17, 1964, National filed its complaint in this action in which it alleged that the increase in rates of water and steam by the Authority was a breach of the contract and that it paid such rates for water and steam furnished it under protest. It further alleged that prior to March, 1950, it was operating numerous plants economically located for sources of raw material and for economical transportation of its finished products to various markets throughout the United States, and that to meet the growing needs of its business National, prior to March, 1950, decided to locate a new paper plant at some convenient point in northeastern Oklahoma; that as a result of negotiations between the Authority and National, the Authority agreed to sell to National a certain industrial site for the construction of such paper plant,

and as a part and parcel of such transaction, to induce National to purchase such industrial site and construct its plant thereon and to become a customer of the Authority, the Authority agreed to furnish National with its requirements of electrical energy and agreed to sell to National its requirements of water, steam and air under the specific terms and conditions set forth in the contract referred to above.

National further alleged that in reliance upon such contract and the performance thereof by the Authority, National purchased the industrial site from the Authority and at great expense constructed a substantial plant thereon and from the date of its completion has continued to operate such industrial plant; that in the operation thereof, National continuously requires not only a dependable source of electric power but also steam, water and air in substantial quantities; and that it is necessary for National to operate such plant continuously to enable it to perform its contract with its various customers.

The trial court held that the Authority had plenary power to operate, manage and conduct its business including the power to establish rates and charges for water and steam to be furnished by it for a definite term, and that it had the power to enter into a contract to furnish water and steam at such rates throughout such term. It concluded that the rate changes which the Authority undertook to make in 1960 and 1964 violated the contract referred to above.

82 Okl.St.Ann. § 868 provides as follows:

"The Board [of the Dam Authority] shall establish and collect rates and other charges for the sale or use of water, water connections, power, electric energy or other services sold, furnished, or supplied by the District which fees and charges shall be reasonable and nondiscriminatory and sufficient to produce revenue adequate:

"(a) To pay all expenses necessary to the operation and mainte-

nance of the properties and facilities of the District;

"(b) To pay the interest on and principal of all bonds issued under this Act when and as the same shall become due and payable;

"(c) To pay all sinking fund and/or reserve fund payments agreed to be made in respect of any such bonds, and payable out of such revenues, when and as the same shall become due and payable; and

"(d) to fulfill the terms of any agreements made with the holders of such bonds and/or with any person in their behalf. Out of the revenues which may be received in excess of those required for the purposes specified in sub-paragraphs (a), (b), (c) and (d) above, the Board shall establish a reasonable depreciation and emergency fund, and retire * * * bonds issued under this Act, or apply the same to any corporate purpose. It is the intention of this Act that the rates and charges of the District shall not be in excess of what may be necessary to fulfill the obligations imposed upon it by this Act.

"Nothing herein shall be construed as depriving the State of Oklahoma of its power to regulate and control fees and/or charges to be collected for the use of water, water connections, power, electric energy, or other services, provided, that the State of Oklahoma does hereby pledge to and agree with the purchasers and successive holders of the bonds issued hereunder that the State will not limit or alter the power hereby vested in the District to establish and collect such fees and charges as will produce revenues sufficient to pay the items specified in sub-paragraphs (a), (b), (c), and (d) of this Section * * * , or in any way to impair the rights or remedies of the holders of the bonds, or of any person in their behalf, until the bonds, together with the interest thereon, with interest on un-

paid installments of interest and all costs and expenses in connection with any action or proceedings by or on behalf of the bondholders and all other obligations of the District in connection with such bonds are fully met and discharged."

82 Okl.St.Ann. § 862(n) grants to the Authority the power "[t]o make contracts and to execute instruments necessary or convenient to the exercises of the powers, rights, privileges and functions conferred upon it."

On December 18, 1950, the Authority entered into a contract with the City of Pryor, Oklahoma, for the sale of water at specified rates for a definite term. That contract made no provision for changing such rates during the term. On January 9, 1951, it entered into a contract with the Coronado Manufacturing Company for the sale of electric energy, steam and water for specified rates set forth in the contract. That contract provided for the changing of the rates for electric energy by the Authority but made no provision for changing the rates for water and steam which were fixed for a definite term under the contract. And on October 3, 1952, the Authority contracted with the City of Chouteau, Oklahoma, for the sale of water for a definite term, at rates specified in the contract. That contract contains no provision for the changing of the rates by the Authority and such rates were fixed for a definite term by the contract.

While the Authority also entered into other contracts in which it reserved the power to change rates, it is clear that the Authority in 1950, 1951 and 1952 construed Section 868, supra, as giving it the power to establish rates and charges for water and steam for a fixed period and Section 862(n), supra, as giving it the power to contract to furnish water and steam for such fixed period at such unchangeable rates. The Act creating the Authority and defining its powers was amended in 1955 (Oklahoma Session Laws, 1955, p. 474) and again in 1957 (Oklahoma Session

Laws, 1957, p. 562). In neither of such amendatory acts did the Legislature amend or change Section 862(n), supra, or limit or take away the power of the Authority to establish and contract for fixed rates for a definite period which the Authority had theretofore exercised and which constituted an administrative construction of the Act. The Legislature therefore impliedly approved such administrative construction of the Act made by the Authority.[3]

The Authority contends that Article 18, Section 7 of the Oklahoma Constitution [4] prohibits it from entering into a contract which establishes fixed rates, relying upon City of Bartlesville v. Corporation Commission, 82 Okl. 160, 199 P. 396; City of Pawhuska v. Pawhuska Oil & Gas Co., 64 Okl. 214, 166 P. 1058, writ of error dismissed, 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054; and American Indian Oil & Gas Co. v. George F. Collins & Co., 157 Okl. 49, 9 P.2d 438, as supporting their contention. We think those cases are not controlling in the instant case. In City of Bartlesville v. Corporation Commission, supra, the Oklahoma Supreme Court held that the Corporation Commission had the power to change the rates charged by a non-municipal gas company in Bartlesville notwithstanding a home rule city charter provision authorizing the city to fix and regulate such rates. In City of Pawhuska v. Pawhuska Oil & Gas Co., supra, the Oklahoma Supreme Court held that the rate for gas supplied to the inhabitants of Pawhuska by a non-municipal gas company could be changed by the Corporation Commission notwithstanding a provision in the franchise granted by the City to the gas company prior to the time the Corporation Commission was granted power by the Legis-

lature to regulate the rates of public utilities, establishing a maximum rate for gas. And in American Indian Oil & Gas Co. v. George F. Collins & Co., supra, the Oklahoma Supreme Court held that a ten-year contract between a non-municipal gas company and a private consumer which established a fixed rate for gas was binding upon the parties so long as no rate had been established by the Corporation Commission, but ceased to be effective as to rates when the Corporation Commission had established rates.

Those cases all involved rate changes made by the Corporation Commission. The rates charged by public utilities in Oklahoma are controlled and regulated by the Corporation Commission.[5] But the Authority is a "body politic" [6] and as such it is expressly excluded from the statutory definition of a public utility [7] and its rates and charges are not subject to control or regulation by the Corporation Commission. The only limitations upon the rate making powers of the Authority are those imposed by the Legislature which appear in 82 Okl.St.Ann. § 868, supra.

Furthermore, each of the cases relied upon by the Authority involve an attempt by the user to fix rates so as to prevent the duly constituted rate making agency designated by the Legislature from performing its rate making duties. In the instant case the Legislature designated the Authority as the agency to fix its own rates, and any rates set by it, whether by contract or otherwise, if set according to law are subject to change only by the Legislature. Hence there was no surrender of the power to regulate as there was in the cases cited by the Authority. Rather there was an exercise of such power.

3. Realty Mortgage & Sales Co. v. Oklahoma Emp. Sec. Comm., 197 Okl. 308, 169 P.2d 761, 770.

4. Article 18, Section 7 of the Oklahoma Constitution provides in part as follows: "Nor shall the power to regulate the charges for public services be surrendered; * * *."

5. 17 Okl.St.Ann. § 152.

6. 82 Okl.St.Ann. § 861; International Brotherhood of Electrical Workers, Local Union 976 v. Grand River Dam Auth., Okl., 292 P.2d 1018, 1019.

7. 17 Okl.St.Ann. § 151.

■ The Authority further contends that its revenues are inadequate to meet the requirements of § 868, supra, and that therefore the contract is void. We do not agree.

The only evidence in the record as to the insufficiency of the fees and charges made by the Authority was an exhibit which tabulated revenue and expenses for a 5½ year period. That exhibit shows in part the following:

| Year | Outstanding Bonds | Total Revenues | Operation & Maintenance | Debt Service |
|---|---|---|---|---|
| 1959 | 20,767,000.00 | 4,459,498.46 | 3,100,320.39 | 952,446.27 |
| 1960 | 20,951,000.00 | 4,912,646.18 | 3,399,790.52 | 978,016.21 |
| 1961 | 50,000,000.00 | 4,964,426.27 | 3,034,510.26 | 1,056,738.19 |
| 1962 | 50,000,000.00 | 5,390,983.20 | 3,870,211.48 | 643,100.00 |
| 1963 | 50,000,000.00 | 5,963,719.16 | 5,628,525.84 | 643,100.00 |
| 1964 (6 mo) | 50,000,000.00 | 3,910,661.09 | 2,825,829.69 | 1,336,255.36 |
| Total | | 29,601,934.36 | 21,859,188.18 | 5,609,656.03 |

| Year | Debt. Ser. Res. Fund | Contingency Fund | Depreciation | Gain or Deficit* |
|---|---|---|---|---|
| 1959 | 35,790.30 | 50,000.00 | 607,035.80 | 286,094.30* |
| 1960 | 63,695.72 | 50,000.00 | 593,070.42 | 171,926.69* |
| 1961 | 98,036.95 | 50,000.00 | 585,674.55 | 139,466.32 |
| 1962 | 283,680.63 | 250,000.00 | 614,651.16 | 270,660.07* |
| 1963 | 283,680.63 | 250,000.00 | 617,660.68 | 1,459,247.99* |
| 1964 (6 mo) | 141,840.32 | 125,000.00 | 328,803.86 | 847,068.14* |
| Total | 906,724.55 | 775,000.00 | 3,346,896.47 | 2,895,530.87* |

It should be noted that § 868, supra, permits the establishment of depreciation and emergency funds only "[o]ut of the revenues which may be received in excess of those required for the purposes specified in sub-paragraphs (a), (b), (c) and (d)" of § 868, yet in each of the years in which the above tabulation shows a deficit, there were set up as expense items depreciation and contingency reserve. We think that a contingency fund and an emergency fund are the same.

Revenues in excess of those required for the purposes specified in sub-paragraphs (a), (b), (c) and (d) of § 868, supra, were not available in the amounts charged as expenses for depreciation and emergency in 4½ years. Had such expenses not been so charged, there would have been no deficit in 1950, 1960 and 1962.

■ Since the Authority decided to set rates for water and steam sold to National by contract for a 25-year period, the Authority was obligated by § 868, supra, when the contract was negotiated to establish rates which would be reasonable and nondiscriminatory and which it then determined would be sufficient to produce revenue adequate to pay operation and maintenance expenses, to pay interest and principal on bonds, to pay sinking and reserve fund payments, and to fulfill the terms of any agreements with bondholders. In other words the Authority was obligated at the time the contract was entered into to determine what rates in its considered judgment would be adequate to meet the re-

quirements of § 868 during the term of the contract and fix the applicable rates accordingly. Presumably it performed that duty and made such determination, and the fact, if it be a fact, that actual experience has shown the prospective determination of the rates, although fully adequate at the beginning of the contract term, later turned out to be inadequate, does not retroactively make the initial determination improper or unlawful and does not render void the contract rates.

■ National contends the action of the Authority was an impairment of its contract. We do not think the question of impairment of contract is involved. In its usual connotation, impairment of contract means impairment by legislative action. No such action has occurred. The issue rather is one of simple breach of contract.

We conclude the Authority had the power to fix rates for water and steam for a definite term and to contract to furnish water and steam for such period at such fixed rates.

Affirmed.