**UNITED STATES of America**

v.

**TEX–LA ELECTRIC COOPERATIVE, INC.**

Civ. A. No. 80–2813.

United States District Court,
E. D. Louisiana.

Sept. 9, 1981.

410

James M. Tompkins, McGlincey, Stafford, Mintz, New Orleans, La., Ralph J. Gillis, Plymouth, Mass., Northcutt Ely, Frederick H. Ritts, Washington, D.C., for defendant.

Elizabeth O'Connell, Marc J. Yellin, Asst. U.S. Atty., New Orleans, La., Leland Ware, C. Max Vassanelli, Alice Daniel, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

## OPINION

ARCENEAUX, District Judge.

At the preliminary pre-trial conference held in this matter, it was stipulated by both parties that there are no disputed issues of material fact. Accordingly, the Court's decision relative to the parties' cross motions for summary judgment is dispositive of the case.

Oral argument was heard on April 22, 1981, and the parties were allowed to further supplement their numerous pre-trial memoranda.

Having reviewed the applicable law, the facts of the case, and the comprehensive memoranda submitted by both parties, IT IS ORDERED that the summary judgment of defendant Tex-La Electric Cooperative, Inc. (Tex-La) be GRANTED, and the corresponding motion of plaintiff be DENIED.

## BACKGROUND

Section 5 of the 1944 Flood Control Act, 16 U.S.C. § 825s[1] establishes the governmental functions which are to be exercised

---

1. The 1944 Flood Control Act, Section 5, reads as follows:

"Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Federal Power Commission. Rate schedules shall be drawn having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years. Preference in the sale of such power and energy shall be given to public bodies and cooperatives. The Secretary of the Interior is authorized, from funds to be appropriated by the Congress, to construct or acquire, by purchase or other agreement, only such transmission lines and related facilities as may be necessary in order

in the sale of federal hydropower from reservoir projects constructed by the Army. They include:

1) the transmission and disposal of power and energy;

2) the formulation of appropriate rate schedules; and,

3) the confirmation and approval of rates.

From 1944 to 1977, the first two functions were exercised by the Secretary of the Interior, while the third was under the control of the Federal Power Commission (FPC).

In 1977, the Department of Energy Organization Act (DEOA), 42 U.S.C. § 7151 *et seq.*,[2] transferred the Department of the Interior's power marketing responsibilities and the FPC's rate confirmation and approval functions under the Flood Control Act to the Department of Energy. In December of 1978, the Secretary of Energy delegated his authority to establish rates under the Flood Control Act to the Assistant Secretary for Resource Applications. Delegation Order No. 0204–33, 43 Fed.Reg. 60636–37 (1978).[3] By the same order, the Secretary delegated authority for *final* confirmation of rates to the Federal Energy Regulatory Commission (FERC). The latter was created in 1977 as an independent entity in the Department of Energy.

The Southwestern Power Administration (SWPA) became, by order of the Department of the Interior, the agency responsible for the marketing of reservoir power in the southwestern region of the United States. This region includes Texas and Louisiana. A federal study, completed in 1978, deter-

to make the power and energy generated at said projects available in wholesale quantities for sale on fair and reasonable terms and conditions to facilities owned by the Federal Government, public bodies, cooperatives, and privately owned companies. All moneys received from such sales shall be deposited in the Treasury of the United States as miscellaneous receipts."
16 U.S.C. § 825s.

2. Section 301(b) of the 1977 Department of Energy Organization Act reads as follows:

"(b) Except as provided in subchapter IV of this chapter, there are hereby transferred to, and vested in, the Secretary the function of the Federal Power Commission, or of the members, officers, or components thereof. The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence."
42 U.S.C. § 7151(b).
Section 302 of the 1977 Department of Energy Organization Act provides:

"(a)(1) There are hereby transferred to, and vested in, the Secretary all functions of the Secretary of the Interior under section 825s of Title 16, and all other functions of the Secretary of the Interior, and officers and components of the Department of the Interior, with respect to—

"(A) the Southeastern Power Administration;

"(B) the Southwestern Power Administration;

"(C) the Alaska Power Administration;

"(D) the Bonneville Power Administration including but not limited to the authority contained in the Bonneville Project Act of 1937 and the Federal Columbia River Transmission System Act;

"(E) the power marketing functions of the Bureau of Reclamation, including the construction, operation, and maintenance of transmission lines and attendant facilities; and

"(F) the transmission and disposition of the electric power and energy generated at Falcon Dam and Amistad Dam, international storage reservoir projects on the Rio Grande, pursuant to the Act of June 18, 1954, as amended by the Act of December 23, 1963.

"(2) The Southeastern Power Administration, the Southwestern Power Administration, the Bonneville Power Administration, and the Alaska Power Administration shall be preserved as separate and distinct organizational entities within the Department. . . ."
42 U.S.C. § 7152(a).

3. Delegation Order No. 0204–33, 43 Fed.Reg. at pp. 60636–37 (1978), which in part reads as follows:

"1. There is hereby delegated to the Assistant Secretary for Resource Applications the authority to develop, acting by and through the administrators, power and transmission rates for the power marketing administrations, and the authority to confirm, approve, and place in effect such rates on an interim basis, for such period or periods as he may provide, subject to refund with interest as determined by the Federal Energy Regulatory Commission in accordance with Section 3 hereof. . . ."

mined that costs were not being recovered for SWPA's sales of hydroelectric power. On March 1, 1979, the Assistant Secretary for Resource Applications issued a rate order which increased power and energy rates for SWPA's customers, and placed the new rates into effect on an interim basis, subject to final confirmation by FERC. Order Confirming, Approving and Placing Rates in Effect on an Interim Basis, Rate Order No. SWPA–1 March 1, 1979, 44 Fed.Reg. 13068.

Tex-La, one of those customers, has refused to pay the interim rates until they receive final confirmation and approval by FERC. As a result of this refusal, plaintiff instituted this action pursuant to 28 U.S.C. § 1345. Jurisdiction and venue are uncontested.

There are two Tex-La/U.S. power sale contracts which are pertinent. The first, Contract No. 14–02–001–864 ( # 864),[4] was entered into in 1958, and provides for the sale of "firm SWPA system power". This contract contains the provision that rates may be increased or decreased subject to confirmation and approval by the FPC. The second contract, Contract No. 14–02–0001–921 ( # 921),[5] entered into in 1960,

4. Contract No. 864, as originally confected, provides in pertinent part at Section 2:

"Tex-La shall purchase, receive, and compensate the Government for firm power capacity and associated energy purchased under Section 1 at the rates and in accordance with the terms and conditions of Rate Schedule 'F–1', a copy of which is attached hereto identified as Exhibit '1', and by this reference made a part hereof. It is understood and agreed that the said Rate Schedule 'F–1' may, *with the confirmation and approval of the Federal Power Commission*, be modified, amended, or superseded at any time and from time to time, and that if it is so modified, amended, or superseded, the new rate or rates shall thereupon become effective and applicable to the purchase and sale of firm power capacity and associated energy under this agreement *in accordance with and on the date of the order of the Federal Power Commission containing such confirmation and approval.*" Emphasis added.

The above contract was amended on January 5, 1968, adding a new Section 2:

"(b) At any time after December 20, 1972, and from time to time thereafter, but not more often than every five years, the rates for the sale of firm power capacity and associated energy, as set forth in Subsection (a), above, may be increased or decreased by the Government, *subject to the confirmation and approval of the Federal Power Commission.* Any such new schedule of rates shall become effective and applicable to the purchase and sale of firm power capacity and associated energy under Section 1, hereof, *in accordance with and on the date specified in the order of the Federal Power Commission containing such confirmation and approval.*" Emphasis added.

5. Contract No. 921 pertains to the sale of four specific types of power. The sections pertaining to compensation for each of these sales read as follows:

(a) Article I, Section 4:

"At any time after May 31, 1965, and from time to time thereafter, but not oftener than once every five years, the schedule of compensation for the purchase and sale of Narrows Dam Power and Energy set forth in Subsections (a) and (b) of Section 3, above, may be reviewed and redetermined by SWPA and, *with the confirmation and approval of the Federal Power Commission*, modified, amended, or superceded. If so modified, amended, or superceded, the new schedule of compensation shall become effective and applicable to the purchase and sale of Narrows Dam Power and Energy under this Article I in accordance *with and on the effective date specified in the final order of the Federal Power Commission containing such confirmation and approval.*" Emphasis added.

(b) Article II, Section 5:

"(a) Tex-La shall compensate SPA each month for Peaking Power Capacity and for Peaking Energy scheduled for delivery during the preceding month at the rates set forth in Rate Schedule "P–1", a copy of which is attached to this Agreement identified as Exhibit "1", and by this reference made a part hereof. It is understood and agreed that the rates set forth in the said Rate Schedule "P–1" may, *with the confirmation and approval of the Federal Power Commission*, be modified, amended, or superseded, at any time and from time to time, and that if so modified, amended, or superseded, the new rates shall thereupon *become effective and applicable to the sale of Peaking Power Capacity and Peaking Energy under this Article II in accordance with and on the effective date specified in the final order of the Federal Power Commission containing such confirmation and approval.*" Emphasis added.

(c) Article III, Section 5:

"(b) It is understood and agreed that the rates set forth in the said Rate Schedule "EE" may, *with the confirmation and approval of the Federal Power Commission*, be modified, amended, or superseded, at any

provides for the purchase and sale of other energy amounts and requires that any modification of an existing rate be "in accordance with and on the effective date specified in the final order of the FPC containing such confirmation and approval."

## PLAINTIFF'S CONTENTIONS

In its simplest outlines, plaintiff's argument is as follows:

1) The interim rate increase was necessary for compliance with the terms of the Flood Control Act; and,

2) Such an increase is authorized under the contracts extant between the parties, as well as by the terms of the DEOA. The DEOA grants to the Secretary for the Department of Energy the authority to modify and establish power rates for energy generated by federally owned reservoir projects and also authorizes him to establish rate modification on an interim basis.

The underpinning asserted by plaintiff for the last tenet arises from the administrative odyssey which the Flood Control Act has undergone. As stated above, that act originally provided that rates for energy sale become effective upon confirmation and approval by the FPC. When that body was abolished in 1977, its Flood Control Act functions were transferred to the Secretary of Energy. While some FPC functions were transferred to FERC, the authority to confirm and approve rates under Section 5 of the Flood Control Act was not. Rather, that authority went directly to the Secretary of Energy. He is now vested with the authority to both establish and approve rates.

Plaintiff also asserts that interim rate authority is inherent in the Secretary's general rate-making authority. Plaintiff cites *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942), as evidence of the FPC's analagous authority to impose interim rates under the Natural Gas Act. The Court's decision in that case was based upon its conclusion that the authority to order rate decreases on an interim basis is implicit in the express authority to set rates.

Plaintiff also places much reliance on *Pacific Power & Light Co. v. Duncan, et al.*, 499 F.Supp. 672 (D.Or.1980) and *The Montanta Power Co., et al. v. Edwards, et al.*, Civil Action # 80–842 PA. (D.Or. May 19, 1981). Plaintiff claims that these two cases, arising in the same district court in Oregon, "expressly affirmed the Secretary's interim rate authority". The *Pacific Power & Light Co.* case concluded that the DEOA transferred the Department of the Interior's rate-making authority, as well as the FPC's rate approval functions, to the Department of Energy. Plaintiff contends that this conclusion supports its contention that interim rate authority is inherent in general rate-setting authority. Plaintiff also points to rules of statutory construction for additional support of its "inherency" argument.

Plaintiff candidly describes the financial dilemma facing the Department of Energy, which prompted the imposition of interim rates. FERC's review of any application for a permanent increase will be a lengthy process; one result of any such delay would be the "erosion" of the DOE's power and marketing agencies' financial position. Since "there is no statutory limitation on the Secretary's general rate-making author-

---

time and from time to time, and that if so modified, amended, or superseded, the new rate shall thereupon *become effective and applicable to the sale of Excess Energy under this Article III in accordance with and on the effective date specified in the final order of the Federal Power Commission containing such confirmation and approval."* Emphasis added.

(d) Article IV, Section 3:
"(b) It is understood and agreed that the rates set forth in the said Rate Schedule "IC"

may, *with the confirmation and approval of the Federal Power Commission,* be modified, amended, or superseded, at any time, and from time to time, and that if so modified, amended, or superseded, the new rates shall thereupon become effective and applicable to the sale of Interruptible Capacity and energy under this Article IV *in accordance with and on the effective date specified in the final order of the Federal Power Commission containing such confirmation and approval."* Emphasis added.

ity", and "the use of interim rates is an essential element of the rate-setting process", the Secretary's present course of action is, plaintiff urges, legal and proper.

Plaintiff also concludes that the imposition of interim rates is permitted by the Tex-La contracts. Since those contracts refer to FPC authority, and since that entity no longer exists and has been effectively replaced by the Department of Energy ("DOE"), the DOE is properly "constructively" substituted for the FPC.

In response to defendant's arguments, discussed *infra*, plaintiff denies that FERC has, by law, assumed the FPC's confirmation function. Plaintiff also disputes defendant's contention that this rate order is the first governmental exercise of the imposition of interim rate authority. It cites to other instances of FPC rate modification on an interim basis, which modifications allegedly established an interim rate procedure. Instead of altering that procedure, Congress provided, by enacting the DEOA, "additional statutory support for the utilization of the interim rates".

In reference to defendant's argument that the increase in question would result in contractual breach, plaintiff reiterates that the DOE is the FPC successor. The fact that FERC possesses final confirmation authority does *not*, plaintiff argues, preclude imposition of interim rates, nor does it "resurrect in FERC the FPC's rate confirmation authority". Plaintiff then disputes defendant's reliance on *Arkansas Power & Light Co., et al. v. Schlesinger, et al.*, Civil Action # 79–1263 (D.D.C., October 20, 1980), contending that this case is distinguishable. This distinction arises, plaintiff contends, because the contracts involved in *Arkansas Power* specifically prohibited rate increases relative to a predetermined ceiling. No such prohibition appears in the contracts at issue here.

Plaintiff also emphasizes that the Secretary's order delegating his authority to establish interim rates to the Assistant Secretary for Resource Applications, and delegating authority for final confirmation of those rates to FERC, was proper, since the Secretary is, by statute, empowered to delegate authority as may be necessary to effectuate the purposes of the DEOA. Yet those delegations do not diminish the Secretary's interim rate authority. The authority delegated to FERC did *not* reestablish in FERC the FPC's final confirmation authority.

Plaintiff also cites this Court to the 1981 decision of the District Court for the District of Columbia in *Colorado River Energy Distributors Ass'n, et al. v. Lewis, et al.*, 516 F.Supp. 926 (1981). Plaintiff recites the factual similarities extant between that case and this one, and summarizes that Court's conclusions:

1) that the Secretary for the DOE has authority to establish interim rates; and,

2) that the contracts at issue do not preclude the interim rate procedure.

## DEFENDANT TEX–LA'S CONTENTIONS

Defendant contends that the fine-line delineations urged by plaintiff as to "interim" versus "final" rate confirmation and approval are untenable. Section 5 of The Flood Control Act speaks merely to "confirmation and approval" before a rate becomes effective. Thus, no rate schedule may be implemented *before* confirmation and approval.

The crux of defendant's attack on plaintiff's position, however, is that, while the Secretary of Energy was empowered to delegate the FPC final confirmation and approval function to the FERC, he was *not* empowered to delegate authority to approve and confirm rates on an interim basis to the Assistant Secretary of Energy for Resource Applications inasmuch as the FPC was not empowered to implement interim rates. Any such delegation would also violate the contracts' specific provisions relative to rate modification.

Defendant reads Section 402 of the DEOA as requiring the participation of FERC in rate confirmation and approval because 1) no "re-delegation" or cancellation of FERC's authority has been made in

favor of the Secretary of Energy, and 2) Section 402(e) states that the FERC shall have jurisdiction over matters referred to it pursuant to Section 404. Section 404 requires that the Secretary refer to the FERC any function within the FERC's jurisdiction which may significantly affect that function. Setting rate schedules for wide areas is one such function.

In attacking plaintiff's inherency argument, defendant looks to the language of the Flood Control Act as evidence that no "plenary grant" of rate-making power exists. Rather, it urges that that section specifically negates such a conclusion. The statute also fails to evidence any provision for "interim" (as opposed to final) confirmation and approval. The language of Section 5 of the Flood Control Act is contrasted with various federal and state statutes which either clearly authorize interim rate setting powers *or* contain language sweeping enough to make an inherency argument plausible.

Defendant also attacks plaintiff's proffered contractual construction. The contract's terms do not permit the setting of interim rates, inasmuch as *any* rate modification is subject to FPC "final" approval. Defendant views the *Arkansas Power & Light Co.* decision as standing for the proposition that a contract valid when entered into cannot be modified by the Government when it becomes politically and/or economically disadvantageous.

Defendant seeks to discredit the *Pacific Power & Light* decision by stating that the Court failed to analyze the Flood Control Act's rate-making function, and failed to distinguish between making a rate final and making it effective; the latter occurs only after confirmation and approval.

Defendant also attacks the plaintiff's characterization of the Secretary's rate-making authority as a single rate-making function. Rather, several such functions exist under the various acts (Natural Gas Act, Federal Power Act, Flood Control Act), and each is to be interpreted according to its own "substantive standard".

While defendant concedes that the two contracts' language was drafted so as to incorporate the requirements of Section 5 of the 1944 Flood Control Act, and that these provisions should be interpreted to reflect statutory amendment, no statutory change has occurred which would make a rate—interim or otherwise—effective without confirmation and approval.

## LAW

This Court is not convinced that the terms of the two contracts in question permit a rate increase to become effective prior to confirmation and approval of that rate by either the FERC, pursuant to Delegation Order 0204–33, or by the Secretary of Energy, under the DOE Act, § 301(b).

The language of the two contracts is critical to the above determination. Contract # 864, both in its initial and amended forms, follows Section 5 of the 1944 Flood Control Act, stating that a new rate will become effective "on the date of the order of the Federal Power Commission containing such confirmation and approval". The 1968 amendment of this contract goes even farther, making rate change "subject to the confirmation and approval of the Federal Power Commission". Contract # 961 also contains, in those provisions relative to rate modification, language tracking the language of Section 5 of the 1944 Flood Control Act—i. e., that modification be "with the confirmation and approval of the Federal Power Commission . . . in accordance with and on the date specified in the final order of the Federal Power Commission containing such confirmation and approval". This contractual reference to the necessity of a "final order of the Federal Power Commission" containing approval of the rate modification may not be "read out" by the Department of Energy.

▊ This Court has not been cited to any controlling precedent indicating that interim rate implementation has occurred in past agency action under Section 5 of the Flood Control Act. Interim rate approvals have occurred under the 1938 Natural Gas Act, 15 U.S.C. §§ 717 *et seq.*, ("NGA") and

the 1935 Federal Power Act, 16 U.S.C. § 793 *et seq.*, ("FPA"), but not under Section 5 of the Flood Control Act. The FPA and the NGA differ from the 1944 Flood Control Act. The FPA and NGA regulate investor-owned companies and thus do not regulate state or federal governmental entities. The Flood Control Act, on the other hand, regulates federal power marketing agencies. These entities are, by function and definition, distinguishable.

■ It is well settled that consistent past agency practice in interpretation and application of a statute within the sphere of an agency's general function is of significance. *United States v. Alabama Great Southern Railroad Co.*, 142 U.S. 615, 12 S.Ct. 306, 35 L.Ed. 1134 (1892); *Environmental Protection Agency v. National Crushed Stone Ass'n*, 449 U.S. 64, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980); *Udall v. Tallman*, 380 U.S. 1, 18, 85 S.Ct. 792, 802, 13 L.Ed.2d 616 (1965). This Court finds guidance in the 30 year practice of the Secretary of the Interior in seeking final confirmation and approval of rates by the FPC before they are made effective. Where the abstention of agency action in a given area is suddenly abandoned, based on the argument that new authority has been discovered in the original statute, the existence of the newly claimed authority is frequently denied. *National Labor Relations Board v. Bell Aerospace Co., Division of Textron, Inc.*, 416 U.S. 267, 289, 94 S.Ct. 1757, 1769, 40 L.Ed.2d 134 (1974); *Federal Power Commission v. Panhandle Eastern Pipe Line Co.*, 337 U.S. 498, 513–514, 69 S.Ct. 1251, 1260–1261, 93 L.Ed. 1499 (1949).

■ The three Section 5 functions referred to above (transmission and disposal, formulation of rate schedules and confirmation and approval) were not altered or enlarged by subsequent statutory amendment. While the enactment in 1977 of the DEOA effected the consolidation of these three rate-making functions in the Secretary of Energy, these functions were not thereby expanded or altered. This transfer, contained in Sections 301(b) and 302 did not extinguish any restraints on the exercise of these functions or enlarge it. The interim rates at issue here have not been confirmed and approved by the Secretary of Energy or by the FERC. Yet it is those agency actions which would be required to constitute final rule making.

■ The requirements for rule making by the Secretary of Energy appear in Section 501 of the DEOA, 42 U.S.C. § 7191 (Supp. III, 1979). That section, in pertinent part, reads as follows:

> If any provision of any Act, the functions of which are transferred, vested or delegated pursuant to this chapter, provides administrative procedure requirements in addition to the requirements provided in this subchapter, such additional requirements shall also apply to actions under that provision.

42 U.S.C. § 7191(a)(1). Thus, the Secretary is bound in the promulgation of new rules by the procedures set forth in those acts whose functions were transferred to him.

■ Inasmuch as the Secretary is restrained from making a rate effective prior to its confirmation and approval, his designees are similarly restrained. The March 1, 1979 DOE order implementing rates against Tex-La on an interim basis may not be construed as a final order, nor did the Secretary's Delegation Order No. 0204–33, 43 Fed.Reg. 60636–37 (1978) create *interim* rate implementation authority. If the Secretary of Energy had acted to confirm and approve the proposed rate, he would have exercised the function transferred to him by the DEOA, Section 301(b). No additional approval and confirmation by FERC would be necessary after such final action by the Secretary. However, an *interim* rate, approved by the Assistant Secretary for Resource Applications must receive final confirmation and approval by FERC. No such final agency rule making action has occurred.

■ This Court has reviewed the recent district court cases cited to it by movers, and finds persuasive the reasoning of the *Arkansas Power & Light Co.* decision, *supra*. There, as here, the Government entered into a valid commercial contract. It

is well settled that it is then bound by the terms of that contract. See *The Sinking Fund Cases*, 99 U.S. 700, 719, 25 L.Ed. 496 (1879) which holds:

The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much a repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a state or a municipality or a citizen.

*Id.* at 719.

The exception to this rule will arise when the contract's terms: 1) are in derogation of statutory authority (*Associated Electric Cooperative, Inc. v. Morton*, 507 F.2d 1167, n.17 (D.C.Cir.1974)); 2) affect the United States in the exercise of its paramount authority (*Larionoff v. United States*, 533 F.2d 1167, 1179 (D.C.Cir.1976)); or, 3) implicate the United States in matters of moral turpitude (*United States v. Acme Process Equipment Co.*, 385 U.S. 138, 145, 87 S.Ct. 350, 355, 17 L.Ed.2d 249 (1966)). Another exception would arise should the contract be invalid when confected. *Cf. Grand River Dam Authority v. National Gypsum Co.*, 352 F.2d 130 (10th Cir. 1965). There is no challenge here, however, to the validity of the contracts in issue, nor are the contracts subject to attack under any of the other grounds set forth above.

As stated in the *Arkansas Power & Light Co.* case:

The dictum in *Associated Electric Cooperative* is not authority for the proposition that the Government can alter or repudiate a contract which was valid at the time it was entered into, but later becomes disadvantageous because of changing economic conditions. Similarly, nothing in the legal history cited to this Court indicates that Congress intended the Flood Control Act to give the Government authority to unilaterally alter existing contracts.

*Id.* at *slip op.* 4.

The Court also observed at n.3 that the above-quoted language is consistent with the action taken by the FPC in 1957 when the Secretary of the Interior requested approval of a new rate, which rate was not in accordance with a contract's rate schedule. The FPC, stating that it had no authority to determine that rates set in a valid contract are no longer effective, denied the request.

The legislative history of the 1977 DEOA does not indicate that the rate implementation procedure, whether on an interim or other basis, has been altered by transfer of FPC function to the Secretary of Energy. The DEOA Act Conference Report, H.R. Rep.No.95–539, 95th Cong., 1st Sess. 65 (1977), U.S.Code Cong. & Admin.News, p. 854, states:

The Conference substitute transfers to the Secretary all functions of the Federal Power Commission, except those transferred to or vested in the Federal Energy Regulatory Commission in Section 402 of the Bill.[6]

This Court has been presented with no precedent for the argument that the FPC's Section 5 rate-making function was a plenary one, imbued with some unarticulated interim rate-making power, nor that the transfer of the FPC function somehow effected such a transformation.

■ While delegation of final confirmation and approval authority to the FERC would be appropriate under the DEOA, the Secretary's attempt to delegate *interim* rate approval and confirmation to the Assistant Secretary of Energy for Resource Applications, pending final confirmation by FERC, is not. Such authority was never included in the FPC function under Section 5 of the Flood Control Act, nor was it contained in the DEOA.

■ The Court is cognizant of the fact that the Secretary of Energy is empowered by Section 301 to exercise certain administrative powers transferred to the FERC by Section 402(a)(2) of the DEOA, 42

---

**6.** Under Section 402(a)(1), Federal Power Commission rate-making functions under the Natural Gas Act and the Federal Power Act were exclusively vested by the Conference Bill in the Federal Energy Regulatory Commission.

U.S.C. § 7172(a)(2) (Supp. III 1979). These powers are simply administrative powers which exist under the FPA and NGA. Contrary to the decision, however, in *Pacific Power & Light Co., supra*, this Court does not believe that any NGA or FPA administrative powers enable the Secretary of Energy to implement, under Section 301(b) and 402(a)(2) of the DEOA, interim rates under the 1937 Bonneville Project Act ("BPA"), 16 U.S.C. § 832 *et seq.*[7] Indeed, it would seem clear that any such power would not be administrative, but is clearly substantive. A mere grant of administrative power relative to a particular act will not create plenary rate making power under a different statute. Interim imposition of rates under both the NGA and FPA, however, is an authorized substantive action. *See* 15 U.S.C. § 717(c) and 16 U.S.C. § 824(d). *See also New England Power Co. v. Federal Power Commission*, 467 F.2d 425, 430–31 (D.C.Cir.1972); *aff'd*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). Under Section 5 of the Flood Control Act, however, no substantive statutory foundation exists upon which the Secretary of Energy may implement interim rates.

The plaintiff's argument that the interim imposition of rates is "inherent" in rate making power is unsupported by the language of Section 5 of the Flood Control Act and the DEOA. This Court has reviewed those state and federal court cases cited to it by the parties in which interim implementation of rates was allowed. *See, e. g., Federal Power Commission v. Tennessee Gas Transmission Co.*, 371 U.S. 145, 150, 83 S.Ct. 211, 214, 9 L.Ed.2d 199 (1962); *Natural Gas Pipeline Co., supra; Sellers v. Iowa Power & Light Co.*, 372 F.Supp. 1169, 1170–

1171 (S.D.Iowa 1974). But the statutes at issue in these cases specifically provided for interim rate implementation.[8] Such a specific grant of interim rate-making power does not support plaintiff's "inherency" argument relative to Section 5 of the Flood Control Act. The Secretary of Energy was given specific rate-making powers pursuant to the 1944 Flood Control Act. The transfer of the rate design and confirmation functions did not work, as the plaintiff suggests, some sort of magic merger whereby the Secretary acquired the authority to impose interim rates. No merger of function occurred, but rather only a merging of the exercises of function.

■ The parties agree that the contractual provisions at issue here should be interpreted to reflect statutory amendment. However, there has been no amendment of the rate-making function of Section 5, which function mandates that a rate will become effective only upon confirmation and approval. Nor is "confirmation and approval" of a rate a mere procedural step, as the plaintiff would have this Court find. Rather, "confirmation and approval" is a fundamental function under Section 5 rate making; it constitutes the substantive review whereby a proposed rate is made effective after its design is scrutinized.

Plaintiff relies upon the *Colorado River Energy Distributors* decision, *supra*, in which the Secretary's imposition of an interim rate prior to final approval was upheld. Again, however, this finding was reached relative to statutes which differ from the 1944 Flood Control Act. The statutes at issue there were the Reclamation Act of 1902, 43 U.S.C. § 372 *et seq.*, the

---

7. The Bonneville Project Act is relevant to the issues here, because the rate schedule implementation provisions of the Flood Control Act were patterned after those in the Bonneville Project Act. Conference, H.R.Rep.No.2051, 78th Cong., 2d Sess. 7 (1944).

8. The Iowa statute at issue in *Sellers, supra*, reads as follows:

"However, a public utility *shall have the right at any time after said rates, charges, schedules or regulations have been suspended for ninety days to place in effect* any or all

of such suspended rates, charges, schedules or regulations *by filing with the commission a bond* or other undertaking approved by the commission conditioned upon the refund in a manner to be prescribed by the commission of any amounts collected thereunder *in excess of the amounts which would have been collected under rates, charges, schedules, or regulations finally approved by the commission. . . ."* Emphasis added.
*Iowa Code Ann.* § 476.6 (Supp.1980).

Reclamation Project Act of 1939, 43 U.S.C. § 485 *et seq.* and the Colorado River Storage Project Act of 1956, 43 U.S.C. § 620 *et seq.* While all of these statutes, as well as the Flood Control Act, authorize the sale of hydroelectric power generated by federally owned facilities, the similarities stop there.

Section 9(c) of the 1939 Reclamation Project Act, for example, reads in pertinent part:

Any sale of electrical power or lease of power privileges, made by the Secretary in connection with the operation of any project or division of a project, shall be for such periods, not to exceed forty years, and at such rates as in his judgment will produce power revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost, interest on an appropriate share of the construction investment at not less than 3 per centum per annum, and such other fixed charges as the Secretary deems proper . . . .

43 U.S.C. § 485h(c)[9]. The Court held that this language created a plenary grant of rate-making power (516 F.Supp. at 930–

931). Section 5, however, contains no such broad, sweeping language.

The *Colorado River* decision goes on to state that:

Finding a general power to collect interim rates does not necessarily mean that such rates may be collected immediately from all customers. The terms on which the Secretary sells CRSP power are governed by a contract. The Secretary may not alter its terms unless the alteration is specifically contemplated by the contract or by statute.

At 932.

The contract at issue in that case and those present here are also distinguishable. The *Colorado River* contract reads as follows:

The rate schedule specified in this contract shall be subject to successive modification by the United States through the promulgation of superseding rate schedules. If at any time the United States promulgates a rate schedule superseding the rate schedule then in effect under this contract, it will promptly notify the contractor thereof. Said superseding

---

**9.** Section 9(c) in its entirety reads as follows: "(c) The Secretary is authorized to enter into contracts to furnish water for municipal water supply or miscellaneous purposes: *Provided,* that any such contract either (1) shall require repayment to the United States over a period of years not to exceed forty years from the year in which water is first delivered for the use of the contracting party, with interest not exceeding the rate of 3½ per centum per annum, *if the Secretary determines* an interest charge to be proper, of an appropriate share as *determined by the Secretary* of that part of the construction costs allocated by him to municipal water supply or other miscellaneous purposes; or (2) shall be for such periods, not to exceed forty years, and at such rates *as in the Secretary's judgment* will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges *as the Secretary deems proper,* and shall require the payment of said rates each year in advance of delivery of water for said year. *Any sale of electric power or lease of power privileges, made by the Secretary in connection with the operation of any project or division of a project, shall be for such periods, not to exceed forty years, and at such rates as in his judgment will produce* *power revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost, interest on an appropriate share of the construction investment at not less than 3 per centum per annum, and such other fixed charges as the Secretary deems proper: Provided further,* that in said sales or leases preference shall be given to municipalities and other public corporations or agencies; and also to cooperatives and other nonprofit organizations financed in whole or in part of loans made pursuant to the Rural Electrification Act of 1936. Nothing in this subsection shall be applicable to provisions in existing contracts, made pursuant to law, for the use of power and miscellaneous revenues of a project for the benefit of users of water from such project. The provisions of this subsection respecting the terms of sales of electric power and leases of power privileges *shall be in addition and alternative to any authority in existing laws relating to particular projects.* No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless, *in the judgment of the Secretary,* it will not impair the efficiency of the project for irrigation purposes." 43 U.S.C. § 485h(c) (1976). Emphasis added.

rate schedule, as of its effective date, shall become effective unless the contractor . . . shall elect to terminate this contract . . .

At 932.

██ But the restraints evident in the contractual provisions at issue here do not permit the result reached in the *Colorado River* decision.[10] The Section 5 confirmation and approval function, incorporated into the contracts at hand, cannot be unilaterally abrogated. While rate increases designed to recover costs arising from changed circumstances must be ultimately recoverable under the terms of Section 5, the increases may only be accomplished in the manner provided by the statute.

The DEOA does *not* create a new plenary rate-making power in the Secretary of Energy under Section 5 of the Flood Control Act, nor does it confirm an existing one. A transfer of existing rate design and implementation authority to the Secretary of Energy did occur; however, the implementation powers transferred are no greater than those which existed prior to the transfer.

██ Final rate confirmation and approval by the entity exercising that function is mandated by the contracts at issue. Thus, these rate proposals are "subject to" final confirmation and approval by the rate-making entity, which confirmation and approval has not occurred. Thus, the Motion for Summary Judgment of defendant Tex-La Cooperative, Inc. is GRANTED, and the Cross Motion of plaintiff United States of America is DENIED.

Judgment shall be entered accordingly.