UNITED STATES of America,
Plaintiff-Appellant,

v.

TEX–LA ELECTRIC COOPERATIVE,
INC., Defendant-Appellee.

UNITED STATES of America,
Plaintiff-Appellant,

v.

NORTHEAST TEXAS ELECTRIC COOP-
ERATIVE, INC., Defendant-Appellee.

Nos. 81–3715, 82–2014.

United States Court of Appeals,
Fifth Circuit.

Nov. 26, 1982.

Rehearing Denied Dec. 23, 1982.

Leland Ware, Dept. of Justice, Civil Divi-
sion, Federal Programs Branch, Leonard
Schaitman, Atty., Appellate Staff, Civil

Div., Bruce G. Forrest, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Ralph J. Gillis, Plymouth, Mass., for defendant-appellee.

Before WISDOM, BROWN and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

These consolidated cases come to us on appeal from the Eastern District of Louisiana and the Southern District of Texas. The single appellee,[1] Tex-La Electric Cooperative, Inc., has thus far successfully challenged the validity of the government's new system for setting and raising the rates set out in the schedules according to which federally owned hydroelectric power is sold.

The novel situation that this case presents is this: in 1979, for the first time ever, new and higher federal electricity rates calculated pursuant to the Flood Control Act of 1944 were put into effect on an interim basis without an independent review by an independent agency. Section 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s (1976 & Supp. IV 1980), imposes a requirement that rates first be *prepared* by the Secretary of the Interior and then *approved and confirmed* by the independent Federal Power Commission before becoming effective. It is the practical effect of this bifurcated scheme that forms the basis for this suit. The principal question before us is whether today, when the Federal Power Commission no longer exists (and when its functions have been largely taken over by the Federal Energy Regulatory Commis-

sion), "approved and confirmed" can be interpreted to vest interim rate implementing authority in the hands of the Secretary of the Interior's successor, the Secretary of Energy.

Although we reject many of the government's arguments and accept all of Tex-La's except one,[2] we hold for the reasons given below that the Secretary does have interim ratemaking authority under section 5 of the Flood Control Act of 1944. The decisions of the two district courts are therefore reversed.

## I. HOW THIS CASE HAS ARISEN.

The key to the instant case lies in its history. What follows is not simply "background." Without the complex mix of partly conflicting statutes, rules, and unwritten practices that have come into being since the middle 1930s, this case simply would not have arisen.

### A. Developments in the Law.

At least since the New Deal Congress has from time to time provided for the construction of various dams to control flooding, encourage commerce and navigation, and provide water for farming and other purposes. The hydroelectric potential of these early projects, so important today, was then often purely secondary and, in the case of the Flood Control Act of 1944 that governs the present case, was nearly forgotten entirely. *See* S.Rep.No. 1030, 78th Cong., 2d Sess. 3 (1944) (adding section 5 of the Act to the House bill, which had overlooked the fact that the proposed dams would produce electricity that would have to be sold). Many of these dams were built and run by the Army Corps of Engineers. The Corps was directed to turn over any

---

1. There are actually two appellees in two consolidated cases, *United States v. Tex-La Electric Cooperative, Inc.* (No. 81–3715) and *United States v. Northeast Texas Electric Cooperative, Inc.* (No. 82–2014); however, since both cases present precisely the same legal issues, involve the same disputed funds, and concern exactly the same real parties in interest, we shall treat them throughout this opinion as one case involving "Tex-La" and "the government."

2. We reject the contention of both parties that the 1977 Department of Energy Organization Act, 42 U.S.C. §§ 7101 to 7352 (Supp. IV 1980), does not materially change section 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s (1976 & Supp. IV 1980). We set forth our reasoning in Part II, *infra.*

surplus hydroelectric power to the Secretary of the Interior. The Secretary, in turn, had the responsibility for preparing appropriate rate schedules for the sale of the power. He was required to fix the schedules at the lowest level possible sufficient to pay for the cost of producing and transmitting the power while also amortizing that part of the dam construction costs that could be fairly attributable to the production of power. Flood Control Act of 1944, § 5, 16 U.S.C. § 825s. The hydroelectric facilities, in other words, were statutorily designed to be entirely self-supporting.

In order to sell the hydroelectric power turned over to him by the Corps of Engineers, the Secretary of the Interior created what eventually became five regional Power Marketing Administrations.[3] The immediate defendant in this suit, the Southwestern Power Administration (SWPA), was created in 1943, see 8 Fed.Reg. 12,142 (1943), and was given the authority to manage all of the Corps of Engineers hydroelectric facilities in Arkansas, Kansas, Louisiana, Missouri, Oklahoma, and Texas, see 10 Fed.Reg. 14,527–28 (1945). The administrator of SWPA was delegated the responsibility, among other things, of preparing rate schedules and of doing the necessary accounting and cost allocation studies.

After the rate schedules were drawn up, but before they could become effective, they were submitted to the independent Federal Power Commission for review. The Flood Control Act specifically provides that the schedules were "to become effective upon confirmation and approval by the Federal Power Commission." Flood Control Act § 5. (This is the statutory provision that lies at the heart of this suit.) The Commission would generally hold public hearings, and then render a formal opinion either approving the rates and putting them into effect, or remanding the case to the appropriate Power Marketing Administration for further consideration.[4]

Under this system, all remained relatively peaceful until the mid-1970s. Then two things happened. First, the days of cheap energy ended and those of rapid inflation began, thus making it necessary for the Power Marketing Administrations to raise rates higher and more often than had ever before been necessary. Compare United States Department of the Interior, Bonneville Power Administration, Docket Nos. E–6611, E–6905 & E–7242, 34 F.P.C. 1462, 1464 (1965) (big administrative to-do over three percent rate increase), with Secretary of Energy, Bonneville Power Administration, Docket No. EF–80–2011, 45 Fed.Reg. 79,545, 79,546 (1980) (big administrative to-do over eighty-eight percent increase). And second, in 1977 Congress enacted the Department of Energy Organization Act, Pub.L.No. 95–91, 91 Stat. 565 (codified at 42 U.S.C. §§ 7101 to 7352 (Supp. IV 1980)). The enactment of the DOE Act has given the parties here something to fight about; the rapid rise in the cost of everything over the past few years has made it worth their while.[5]

3. The five PMAs, as they are called, are the Alaska Power Administration, the Bonneville Power Administration (the biggest and most important), the Southeastern Power Administration, the Southwestern Power Administration, and the Western Area Power Administration. The Western PMA is actually a product of the 1977 DOE Act, supra note 2, and was created by the Secretary of Energy to administer certain hydroelectric projects that had previously been run by the Bureau of Reclamation.

4. The procedures followed by the Federal Power Commission and the reasons justifying them present an extremely complex issue that we address in Part III.A, infra.

5. Although the money immediately at stake in the present suit actually amounts to about $46 million, the government has informed us that its total amount at risk under section 5 of the Flood Control Act is about $800 million. It hardly needs emphasizing that if we were to affirm the district court, the power customers who have already paid the interim rates of the several PMAs (which is almost all customers) would create a veritable stampede in their rush to get their money back from the Court of Claims (now the Court of Appeals for the Federal Circuit). A further $400 million in collected interim rates is not at risk because the Bonneville Power Administration's interim collections have been sanctioned in a new act that applies only to the BPA. See Pacific Northwest Electric Power Planning and Conservation Act, § 7(i)(6), 16 U.S.C. § 839e(i)(6) (Supp. IV 1980).

Because of the way it affects the above-quoted provisions of the Flood Control Act, the DOE Act has created the uncertainty that has produced the present suit. Congress passed the DOE Act because it found that "responsibility for energy policy, regulation, and research, development and demonstration is fragmented in many departments and agencies and thus does not allow for the comprehensive, centralized focus necessary for effective coordination of energy supply and conservation programs." DOE Act § 101(4), 42 U.S.C. § 7111(4). The idea behind the Act was centralization and administrative streamlining, but the result for those charged with interpreting the Flood Control Act has been confusion.

The DOE Act transfers the Flood Control Act functions of both the Secretary of the Interior and the Federal Power Commission. With respect to the Secretary of the Interior, the Act plainly provides:

> There are hereby transferred to, and vested in, the Secretary [of Energy] all functions of the Secretary of the Interior under section 5 of the Flood Control Act of 1944, and all other functions of the Secretary of the Interior, and officers and components of the Department of the Interior, with respect to ... the Southwestern Power Administration.

DOE Act § 302(a)(1), 42 U.S.C. § 7152(a)(1). The Secretary of Energy thus unquestionably has the power to prepare rates through his newly acquired designee, the Administrator of SWPA.

The provisions for the functions of the old Federal Power Commission, now abolished in favor of the new (and also independent) Federal Energy Regulatory Commission, are a little more complicated. At a first reading, Title IV of the DOE Act appears to transfer *all* of the hydroelectric power regulating functions of the Federal Power Commission to the new FERC. *See United States v. Sam Rayburn Dam Electric Cooperative, Inc.,* No. H–80–1781, typescript op. at 7–8 (S.D. Tex. Aug. 19, 1982) (explaining how misleading a first reading can be). A closer reading, however, reveals that the only hydroelectric regulatory powers given to the FERC, *see* DOE Act § 402, 42 U.S.C. § 7172, are those included in the Federal Power Act of 1935. The Flood Control Act of 1944, the 1937 Bonneville Power Act, 16 U.S.C. § 832e (1976 & Supp. IV 1980), and the 1974 Federal Columbia River Transmission System Act, 16 U.S.C. § 838g (1976 & Supp. IV 1980), all of which regulate literally scores of federal hydroelectric projects, are not mentioned anywhere in the FERC provisions (title IV) of the DOE Act. We are therefore forced to turn to the "general transfers" section, which provides in pertinent part:

> Except as provided in title IV [the FERC provisions], there are hereby transferred to, and vested in, the Secretary [of Energy] the function of the Federal Power Commission, or of the members, officers, or components thereof.

DOE Act § 301(b), 42 U.S.C. § 7151(b). The legislative history of this section states in plain language that the section "transfers to the Secretary [of Energy] all functions of the Federal Power Commission, except those transferred to or vested in the Federal Energy Regulatory Commission in Section 402." H.R.Rep. No. 539, 95th Cong., 1st Sess. 65 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 925, 936 (Conference Report). *See* S.Rep.No. 164, 95th Cong., 1st Sess. 29 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 854, 882–83 (same). The inevitable conclusion, and the one that nearly everyone has drawn, is that the Secretary of Energy also exercises the confirmation and approval function of the old Federal Power Commission. *See Sam Rayburn Dam, supra,* typescript op. at 8; *United States v. Tex-La Electric Cooperative, Inc.,* 524 F.Supp. 409, 412 (E.D.La. 1981) (the opinion below); *Montana Power Co. v. Edwards,* 531 F.Supp. 8, 10 (D.Or. 1981) (Panner, J.); *Pacific Power & Light Co. v. Duncan,* 499 F.Supp. 672, 677–78 (D.Or.1980) (Panner, J.); Appellant's Opening Brief at 6; Brief for Appellee at 13. *But see City of Fulton v. United States,* 680 F.2d 115, 118 (Ct.Cl.1982) (misreading the statute for the reasons given in this paragraph, *supra,* and in *Sam Rayburn Dam, supra*). The net result is that after Octo-

ber 1, 1977, the effective date of the DOE Act, see Exec. Order No. 12,009, 42 Fed. Reg. 46,267 (1977), reprinted in 42 U.S.C. § 7341 (Supp. IV 1980), the Secretary of Energy was charged both with developing federal hydroelectric power rates as the Secretary of the Interior used to do, and then with confirming and putting those rates into effect as the Federal Power Commission used to do. The Secretary in effect reviewed rates that he was ultimately responsible for developing in the first place.

This rather mysterious state of affairs lasted just over a year. Pursuant to his delegation of authority under section 642 of the DOE Act, 42 U.S.C. § 7252, the Secretary of Energy delegated away all of his federal hydroelectric rate regulation authority on December 22, 1978. He split his power into three components. First, the Assistant Secretary for Resource Applications,[6] acting through the Administrators of the five Power Marketing Administrations, was given the Secretary of the Interior's old power to prepare new rate schedules. Second, the Assistant Secretary was also given the authority "to confirm, approve, and place in effect such rates on an interim basis" pending final approval and subject to refunds with interest. And third, the old Federal Power Commission's final confirmation and approval authority was given to the independent FERC. See Department of Energy, Power Marketing Rates, Delegation Order for Confirmation and Approval, 43 Fed.Reg. 60,636–37 (1978). What used to be a bifurcated procedure—rate development, then rate approval and implementation—has thus become trifurcated: the SWPA develops rates; the Assistant Secretary provisionally approves them and puts

them into effect on an interim basis; and the FERC gives "final" approval, with any interim overcharges being returned with interest.

The Power Marketing Administrations, in any event, remain bound by their pre-DOE Act contracts, some of which greatly restrict the government's right to raise rates at all.[7] The two contracts in the present case, which both appear to be typical federal hydroelectric contracts of their day, essentially track the language of section 5 of the Flood Control Act, with its bifurcated scheme for raising rates. Like any federal hydroelectric power case, the present dispute therefore has a contractual element as well.

### B. The Facts of This Case.

This case arises out of the application of the Secretary's new trifurcated ratemaking procedures to two hydroelectric power contracts between the SWPA and Tex-La, the "864" contract and the "921" contract.[8]

Both contracts are now just over twenty years old. The 864 contract was signed in 1958, and (for our purposes) immaterially amended in 1968. It provides for the sale of firm power and energy to Tex-La at rates developed by SWPA and implemented "with the confirmation and approval of the Federal Power Commission." The 921 contract provides for the sale of four specific kinds of power—the output of a particular dam, peaking power, excess energy, and interruptible capacity—and was signed in 1960, again with subsequent immaterial amendments. The 921 contract specifically calls for rate implementation "on the effective date specified in the final order of the

---

6. In 1981 the Assistant Secretary of Resource Applications' interim rate approval and implementation responsibilities were transferred to the Assistant Secretary for Conservation and Renewable Energy. See Secretary of Energy, Southwestern Power Administration, Docket No. EF79–4011, 47 Fed.Reg. 4562, 4562 n. 1 (1982). To avoid drawing this unnecessary distinction, we refer to both of these officers as the "Assistant Secretary" throughout this opinion.

7. The SWPA's so-called "Aluminum Contract," for instance, has a provision in it forbidding the government from raising rates more often than once every five years. See Southwestern Power Administration, Rate Order SWPA–1, 44 Fed.Reg. 13,068, 13,070 (1979).

8. The two contracts, the material provisions of which are set out as an appendix to Tex-La's brief, are numbered 14–02–001–864 and 14–02–0001–921. Both are extensively quoted from in the opinion of the court below. 524 F.Supp. at 413 & nn. 4–5.

Federal Power Commission containing . . . confirmation and approval" (emphasis added). Despite the slight differences in language between the two contracts, the parties have agreed that both are to be read alike, and that both essentially track the language of section 5 of the Flood Control Act.

The SWPA apparently began to experience its present financial difficulties sometime in the early 1970s. *See United States Department of the Interior, Southwestern Power Administration, Docket No. E–7172*, 42 Fed.Reg. 49,829–30 (FPC 1977) (account of six consecutive "temporary" approvals of existing rates under the 864 and 921 contracts beginning in 1971, and pending increases that somehow never materialized). By the late 1970s, SWPA's mounting deficits had become almost scandalous. The House and Senate appropriations committees demanded to know what was going on, and announced that they "intend[ed] to follow the progress of the Department [of Energy] actions closely so as to assure the necessary attention to this matter." H.R. Rep. No. 1247, 95th Cong., 2d Sess. 59 (1978). When, during the next year, the Administrator of SWPA admitted to a subcommittee of the House appropriations committee that SWPA had not had a rate increase in twenty-one years, *see Energy and Water Development Appropriations for 1980: Hearings Before [the Subcomm. on Energy and Water Dev., House] Comm. on Appropriations*, 96th Cong., 1st Sess. 2996 (1979) (remarks of SWPA Administrator Hammett), responsive questioning from the Committee reflected some impatience, *id.* at 2996–98. Both because of the close congressional interest and because of the clear impossibility of supporting in the 1980s a supposedly self-sufficient program on rate schedules established in 1958 and 1960, SWPA was under considerable pressure to bring its rates up to date.

In 1978 and 1979 SWPA held, after appropriate notices in the Federal Register,

*see, e.g.,* 43 Fed.Reg. 16,545 (1978) (first notice), two "public information forums" and two "public comment forums" so that the views of power customers and the interested public could be incorporated into new rate schedules. SWPA also held an informal meeting with Tex-La and its other customers to work out any remaining differences over how the new rates would be calculated. *See Appropriation Hearings, supra,* at 2997 (chronological summary of events). The new schedules were finally approved by the Assistant Secretary on March 1, 1979, effective April 1. *Southwestern Power Administration, Rate Order SWPA–1,* 44 Fed.Reg. 13,068 (1979). As provided for in the second part of the Secretary's trifurcated procedures, *see* 43 Fed. Reg. 60,636–37 (1978), this approval put the new rates into effect on an interim basis, pending final approval by the FERC. The Assistant Secretary commented: "The public participation process produced numerous and varied questions and comments. All of these have been considered; many have been accepted and incorporated in developing the revised rates." 44 Fed.Reg. at 13,-069. The public participation resulted in a reduction of the originally proposed 42 percent rate increase to 33 percent. *Id.*

After a three-month-long public notice and comment period and a delay of over two years, the FERC finally rendered its decision on the interim rates. *Secretary of Energy, Southwestern Power Administration, Docket No. EF79–4011,* 46 Fed.Reg. 30,877 (FERC 1981). It disapproved of the rates and remanded them to SWPA for further consideration because they were *too low.* This time affirmatively supported by Tex-La and its other customers, SWPA gathered more data and petitioned the FERC to reconsider its decision and approve the rates as originally submitted. After another seven-month delay, the FERC finally approved the original 33 percent increase on January 25, 1982, retroactive to the effective date of the Assistant Secretary's 1979 interim approval order.[9] *See*

9. The parties have informed us that the retroactivity of this final FERC order has become the subject of a motion currently pending be-

fore the United States District Court for the Eastern District of Louisiana. *See United States v. Tex-La Electric Cooperative, Inc.,* Civ-

*Secretary of Energy, Southwestern Power Administration, Docket No. EF79–4011,* 47 Fed.Reg. 4562 (FERC 1982). And that is the end of the administrative part of this story.

Meanwhile, several power customers had contended that the interim rates in effect from April 1, 1979 to (as it turns out) January 25, 1982, were illegal, and either refused to pay them, or did so under protest. *See City of Fulton v. United States,* 680 F.2d 115 (Ct.Cl.1982) (paying under protest); *United States v. Sam Rayburn Dam Electric Cooperative, Inc.,* No. H–80–1781 (S.D. Tex. Aug. 19, 1982) (refusal to pay parallel SWPA rate increase). The two present cases—which are actually just one case, involving the same money, contracts, and real parties in interest—arose when certain of the public electric cooperatives that make up the Tex-La umbrella cooperative refused to pay the increase. The government sued to collect the money owing on August 1, 1980, and March 27, 1981. The parties quickly agreed that there were no material issues of contested fact, and submitted their cases for summary judgment. The Eastern District of Louisiana ruled in favor of Tex-La on September 9, 1981, 524 F.Supp. 409 (E.D.La.1981), and rendered final judgment accordingly on September 14. In the other case, the Southern District of Texas reached exactly the same result on December 9, 1981, "for the reasons stated in the careful analysis of the questions . . . [presented] to be found in the opinion of the United States District Court for the Eastern District of Louisiana." The government now appeals from the judgments rendered in both decisions.

## II. THE EFFECT OF THE 1977 DOE ACT ON SECTION 5 OF THE FLOOD CONTROL ACT OF 1944.

Both parties, the court below, and every other court to consider the question have assumed that the DOE act has merely reorganized the functions of two of the principal federal hydroelectric power acts, thus leaving their substantive and procedural provisions entirely unaffected.[10] We respectfully disagree. The answers to the two specific questions presented on this appeal, namely, whether the Secretary's trifurcated procedures comply with section 5 of the Flood Control Act of 1944 and with the terms of the 864 and 921 hydroelectric power contracts, depend partly on the wording of the statutes and partly on the intent of the Congresses that enacted them.

### A. The Flood Control Act of 1944.

■ The text of the Flood Control Act and the intent of the Congress that enacted it in 1944 must necessarily be the starting points for any inquiry into the meaning that must now be given to the operative phrase, "the rate schedules to become effective upon confirmation and approval by the Federal Power Commission." Flood Control Act § 5, 16 U.S.C. § 825s. We think that Congress's intent leaves virtually no room for doubt. Because the original Flood Control bill did not provide for the sale of hydroelectric power, what is now section 5 was added by the Senate. And the Senate Report, like the House Conference Report that followed, did nothing more than indicate that what became section 5 was an adoption of the scheme set out in section 6 of the Bonneville Project Act of 1937. *See* S.Rep. No. 1030, 78th Cong., 2d Sess. 3 (1944) (adding section 5 and explaining why it was needed); H.R.Rep. No. 2051, 78th Cong., 2d Sess. 7 (1944) (Conference Report). For guidance we must therefore look to section 6 of the Bonneville Project Act, which, exactly like the Flood Control Act, provides that rates "shall be prepared by the [appropriate Department of the Interi-

---

il Action No. 80–2813, § K, Mag. 4 (E.D.La. filed May 10, 1982).

**10.** The two major federal hydroelectric power statutes that contain the same bifurcated rate-making procedures are the Flood Control Act of 1944 and its model, the 1937 Bonneville

Project Act, 16 U.S.C. § 832e (1976 & Supp. IV 1980). The cases construing the acts are listed in the third-to-last paragraph of Part I.A, *supra. See also* Federal Columbia River Transmission System Act § 9, 16 U.S.C. § 838g (1976 & Supp. IV 1980) (same scheme).

or] administrator and become effective upon confirmation and approval thereof by the Federal Power Commission." Bonneville Project Act § 6, 16 U.S.C. § 832e (1976 & Supp. IV 1980).

Section 6 of the Bonneville Project Act was extensively discussed in various committees of both the seventy-fourth and seventy-fifth Congresses, and the question of who should have the power to set rates and why received especially close attention. The hydroelectric power provisions of the Act were drafted and recommended by a special Presidential commission chaired by Secretary of the Interior Harold L. Ickes called the National Power Policy Committee. Secretary Ickes's lucid and detailed explanation of the language that eventually found its way into both section 6 of the Bonneville Project Act and section 5 of the Flood Control Act is thus worth quoting in full:

> The Power Policy Committee suggested that the rate schedules should be prepared in the first instance by the [Secretary of the Interior's Local Power] Administrator, because the fixing of rates during the early years at least will depend largely upon an informed judgment of potentially available markets which can be made only by a study at close range. Such study may, it would seem, be more effectively carried on under the direction of the Administrator on the spot than under the direction of the [Federal] Power Commission. On the other hand, it would be desirable that the Administrator's allocation of costs between the various purposes of navigation, flood control, irrigation, and power which might be served by a multiple-purpose project like Bonneville . . ., the estimates of operating costs, and the policies to be pursued to develop the widest possible markets, might appropriately be *checked and audited by a national agency in the light of national policy.* The primary responsibili-

ty for the development of rate schedules adaptable to regional circumstances should be the Administrator's, but certain advantages might be obtained by having the rate schedules, after they are prepared by the Administrator, approved by a national agency as being in conformity with national policy.

*Columbia River (Bonneville Dam), Oreg. and Wash.: Hearings Before the [House] Comm. on Rivers and Harbors . . . on H.R. 7642,* 75th Cong., 1st Sess. 143–44 (1937) (prepared statement of Secretary of the Interior Harold L. Ickes) (emphasis added). There appears to have been no doubt in anyone's mind that a Federal Power Commission review in light of "national policy" in part meant "the protection . . . of all the users of surplus electric energy generated at [Federal] projects" from excessive rates. S.Rep. No. 2280, 74th Cong., 2d Sess. 2 (1936) (Report on S. 4695, 74th Cong., 2d Sess. (1936), a predecessor of H.R. 7642); H.R.Rep. No. 2955, 74th Cong., 2d Sess. 2 (1936) (report on H.R. 12873, also a 74th Cong., 2d Sess., predecessor of H.R. 7642); moreover, the statute itself reflects Secretary Ickes's expressed concern about the imposition of "undue cost[s] upon . . . consumers," *Hearings on H.R. 7642, supra,* at 143 (remarks of Secretary Ickes), by providing that rates "shall be fixed and established with a view to encouraging the widest possible diversified use of electric energy." Bonneville Project Act § 6. *See also* Flood Control Act § 5 (rates shall be established "in such manner as to encourage the most widespread use [of federal power] at the *lowest possible rates* to consumers consistent with sound business principles") (emphasis added). We think that this wealth of detail and specificity from Secretary Ickes's congressional testimony is more than simply "probative." As chairman of President Roosevelt's National Power Policy Committee, Secretary Ickes was responsible for drafting what became section 6; [11]

11. The peregrinations of what became section 6 require a footnote. The two bills recommended by the committees of the second session of the seventy-fourth Congress, S. 4695 and H.R. 12873, both placed *all* of the ratemaking func-

tion in the hands of the Federal Power Commission. This, however, was a departure from the language recommended by the eventual draftsmen, Secretary Ickes's National Power Policy Committee. At the same time, it was

as Secretary of the Interior he was also ultimately responsible for carrying its provisions into effect through his designee, the Bonneville Project Administrator (and eventually the Administrator of each PMA). We therefore conclude that Congress unmistakably intended that the Federal Power Commission apply its ratemaking expertise partly to protect consumers from undue rate increases instituted by the local power administrators. *See also Hearings on H.R. 7642, supra,* at 150 (colloquy between Secretary Ickes and Representative Culkin explaining desirability of giving rate review function to an "expert" Commission).

### B. The DOE Act.

The next, and more important question is what, if any changes the 1977 Congress intended to make in the bifurcated scheme of the 1937 and 1944 Acts. We turn first to what the DOE Act says, and then to what those who wrote and enacted it intended.

### 1. The "Plain" Meaning of the Act.

The "plain" meaning of the DOE Act presents a contradiction between two different theories, the "transferred but not changed" theory and the "deliberate amendment" theory. We think that even upon a bare reading of the statute the second of these is the more persuasive.

The case for the "transferred but not changed" theory at first seems appealing. The DOE Act actually *says* that its provisions were written in an effort to leave the then present law intact. Two sections are

especially relevant. First, the "general transfers" section quoted above, DOE Act § 301(b), 42 U.S.C. § 7151(b), provides that the functions of the Federal Power Commission not expressly given to the FERC are "transferred to" the Secretary of Energy. And, as Tex-La has correctly pointed out, the word "transferred" necessarily precludes any notions of enlargement or expansion. Second, section 501 of the Act, entitled "Procedures," provides:

> If any provision of any Act, the functions of which are transferred, vested, or delegated pursuant to this Act, provides additional procedure requirements in addition to the requirements provided in this title, such additional requirements shall also apply to actions under that provision.

DOE Act § 501(a)(1), 42 U.S.C. § 7191(a)(1). Since section 5 of the Flood Control Act on its face requires a bifurcated ratemaking procedure, it would seem that the quoted "procedural continuation" portion of section 501 would also require that this system remain unchanged.

We think, however, that upon closer examination the "transferred but not changed" theory collapses immediately and cannot be supported under any theory of statutory construction. We further believe that an understanding of what the 1977 Act actually did to the Flood Control Act leads unavoidably to the conclusion that the Secretary's present trifurcated ratemaking procedures are fully consistent with the demands of both statutes.

also the scheme preferred by the Federal Power Commission itself. *See* Letter from the Federal Power Commission to the House Rivers and Harbors Committee (May 3, 1937), *reprinted in Hearings on H.R. 7642, supra,* at 499–500. As a compromise, Secretary Ickes offered to give the Commission the power to revise rates, through the insertion of the following provision:

> If any rate schedule submitted by the Administrator is not approved by the Federal Power Commission, the Federal Power Commission may revise such schedule in conformity with the standards prescribed by this act, and as so revised such schedule shall become effective.

*Hearings on H.R. 7642, supra,* at 144 (remarks of Secretary Ickes, reading the proposed com-

promise amendment aloud to the Committee). When H.R. 7642 was reported out of the Committee, it duly included the above power-to-revise language. H.R. 7642, 75th Cong., 1st Sess. § 5 (1937), *Hearings on H.R. 7642, supra,* at 509, 512. *See* H.R.Rep. No. 1090, 75th Cong., 1st Sess. 3 (1937) (committee report recommending the bill). But then the power-to-revise language was deleted before this part of the bill, redesignated section 6, was finally considered by the full House. *See* H.R.Rep. No. 1507, 75th Cong., 1st Sess. 3, 5 (1937) (Conference Report) (setting out the full text of H.R. 7642, as revised). The Act therefore implements the original recommendation of Secretary Ickes's National Power Policy Committee.

What the DOE Act actually did, as we have explained above, *see* Part I.A *supra,* was give the Secretary of Energy both the Secretary of the Interior's authority to develop rates and the Federal Power Commission's authority to confirm and approve them. Tex-La and the government both agree, as they must, that in the fifteen-month interval from October 1, 1977 (the effective date of the DOE Act), to January 1, 1979 (the effective date of the Secretary's delegation order), the Secretary of Energy arguably could have done almost anything to implement rates, so long as he complied with the "notice and comment" provisions of the Administrative Procedure Act.[12] The DOE Act thus carries within itself an obvious contradiction: while expressly providing that the administrative features of the Flood Control Act should continue unimpaired, the DOE Act, by unifying all ratemaking authority in the person of the Secretary of Energy, also makes it virtually impossible that this should be the case. If the 1977 Congress had truly wanted to preserve the pristinely independent Federal Power Commission review provided for in the Flood Control Act, it would not have unified rate authority in the Secretary. Without regulations [13] or a statute, a true separation of functions by definition cannot exist in one person.[14]

No one who accepts the basic outlines of the statutory and historical analysis presented in Part I.A of this opinion—Tex-La, the government, and the court in *Sam Rayburn Dam, supra* —has pretended not to see this obvious internal contradiction in the statute. The court's theory in *Sam Rayburn Dam* was that Congress simply made a mistake. *See Sam Rayburn Dam, supra,* typescript op. at 18 ("This Court readily concedes that it does not always understand the reasoning or logic behind all of the enactments by the Legislature, but it is the role of the judiciary to interpret and apply the laws and not to question the wisdom of those who made the laws."). Tex-La's theory is that although the statute may have inexplicably unified the two functions in the Secretary, the real mistake is his for having delegated away part of his power to the independent FERC (which he cannot control) instead of having invested it entirely in his own Assistant Secretary.

Having identified the internal contradictions in the DOE Act after a literal examination of its specific provisions, we are forced to turn to its general provisions, its overall purpose and design, in order to determine what the legislature must have intended. It is, as the Supreme Court has repeatedly pointed out, "a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Philbrook v. Glodgett,* 421 U.S. 707, 714, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975) (quoting *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)). *See* H. Hart & A. Sacks, *The Legal Process* 1415 (tent. ed. 1958) ("The whole

12. Because ratemaking is rulemaking, *see* APA § 5(c), 5 U.S.C. § 554(d) (1976), a full adjudicative hearing is not required. The provision in the APA that had exempted ratemaking for the sale of federally owned power from *all* provisions of the APA, APA § 4, 5 U.S.C. § 553(a)(2), was expressly overridden in section 501(b)(3) of the DOE Act, 42 U.S.C. § 7191(b)(3). The question of who has to give what kind of "process" when is treated in more detail in Part III, *infra.*

13. The Secretary has promulgated such rules, now codified at 10 C.F.R. § 903 (1982); moreover, we think that he was under a statutory obligation to do so, *see* Part III, *infra.*

14. Although FERC is part of the Department of Energy, it is independent. *See* DOE Act § 401, 42 U.S.C. § 7171. Similarly, the General Coun-

sel's office of the NLRB is part of the Board, but it, too, is independent. *See* NLRA § 3(d), 29 U.S.C. § 153(d) (1976). The DOE Act, on the other hand, while retaining the Power Marketing Administrations as distinct organizational entities, places them under the complete control of the Secretary. *See* DOE Act § 302(a)(2), 42 U.S.C. § 7152(a)(2). There is no real independence at all, though in practice, of course, the Secretary could not possibly take the time to supervise closely the day-to-day affairs of each PMA. This "practical impossibility of close supervision" argument, however, could be made to apply to almost any complicated bureaucracy (whose subordinate members could hardly consider themselves "independent").

402

context of a statute may be examined in aid of its interpretation, and should be whenever substantial doubt about its meaning exists in the interpreter's mind, or is suggested to him."); *see also* F. Lieber, *Legal and Political Hermeneutics* 20 (3d ed. St. Louis 1880) (1st ed. Boston 1839) ("However minutely we may define, somewhere we needs must trust at last to common sense and good faith."). Recourse to a statute's overall purpose and design is, moreover, especially justified when the purpose of the statute is unambiguous.

As expressed in virtually every provision of title I ("Declaration of Findings and Purposes"), the purpose of the DOE Act is to improve the efficiency of American energy production and unite the scattered governmental divisions with responsibility in the area under the leadership of a single new cabinet-level officer, the Secretary of Energy. *See* DOE Act §§ 101–102, 42 U.S.C. §§ 7111–7112. *See also* S.Rep. No. 164, 95th Cong., 1st Sess. 5 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 854, 858 ("Under the Department of Energy, responsibility for the formulation of energy policy will be vested in a single official, the Secretary of Energy, who will be supported by a unified organization with the authority to direct Federal actions needed to implement that policy."); H.R.Rep. No. 539, 95th Cong., 1st Sess. 55 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 925, 925–26 (Conference Report) (same). In the eyes of Congress, divisions of authority—here, between the Secretary of the Interior and the Federal Power Commission—were a positive evil, something which the statute was designed to correct. Congress did not, in other words, unite the federal hydroelectric ratemaking authority of the Secretary of the Interior and the Federal Power Commission in the person of the Secretary of Energy by mistake. On the contrary, Congress seems to have done everything within its power to indicate that the unification was accomplished *on purpose*.

### 2. The Legislative History of the DOE Act.

The legislative history of the DOE Act reinforces this conclusion. Congress could not have been more explicit. Those who drafted the bill that became the DOE Act believed so strongly in the need for a highly centralized Energy Department with absolute control over the entire area that the original bill did not have any independent Federal Energy Regulatory Commission at all.

The first Secretary of Energy, Dr. James Schlesinger, was responsible for the final drafting and preparation of the bill for submission to Congress. *See* S. 826, 95th Cong., 1st Sess. (1977), *Department of Energy Organization Act: Hearings before the [Senate] Comm. on Governmental Affairs . . . on S. 826,* 95th Cong., 1st Sess. 4 (1977); H.R. 4263, 95th Cong., 1st Sess. (1977), *Department of Energy Organization Act: Hearings before a Subcomm. of the [House] Comm. on Government Operations . . . on H.R. 4263,* 95th Cong., 1st Sess. 2 (1977) (S. 826 and H.R. 4263 were the same bill). His original version created an independent "Board of Hearings and Appeals" that, as everyone came to understand it, had virtually no jurisdiction: the only cases that the Secretary had to refer to the Board were those "required by law to be made on the record after opportunity for an agency hearing." S. 826 & H.R. 4263 § 401(a)(2). Since ratemaking is rulemaking and thus by definition not subject to adjudicative hearing requirements, Dr. Schlesinger and his colleagues were forced to concede that if the Board were ever given anything much to do it would not be through the interpretation of the language of any statute. *See, e.g., Hearings on H.R. 4263, supra,* at 674 (remarks of FEA General Counsel Fygi). Thus all interstate gas and electric power regulation, public and private, was left to the absolute discretion of the Secretary of Energy. Secretary Schlesinger's articulated defense of this unprecedented concentration of power in the hands of an executive officer was that "pricing is an integral part of [energy] policy," and that the whole purpose of the proposed DOE Act was to centralize policymaking in one executive department. *Hearings on S. 826, supra,* at 151 (remarks of Dr. Schlesinger).

In response to questions from the Senate committee, the Chairman of the Federal Power Commission confirmed that Dr. Schlesinger's contemplated centralization would effect a juncture of the two rate-making functions set out in section 5 of the Flood Control Act and section 6 of the Bonneville Project Act:

> Now, in regard to the Bonneville and the Southwest[ern] and Southeast[ern] Power Administration[s], there is an example of where I believe greater coordination can be achieved. At the present time, [the] Department of the Interior proposes those rates, and the FPC confirms them.

*Hearings on S. 826, supra,* at 179 (remarks of FPC Chairman Dunham). Far from being overlooked or somehow forgotten, the two-stage ratemaking procedure at issue in the present case represented *specifically* the kind of inefficiency and fragmentation of authority that the DOE Act was designed to correct.

Introducing the bill in Congress, however, and actually getting it passed proved to be two entirely different matters. Led in part by Representative Moss of California, both the Senate and the House balked at vesting so much power in the hands of one officer of the executive department rather than in those of an at least nominally independent agency. In the Senate, Dr. Schlesinger's proposal never even made it out of committee. The version of S. 826 introduced on the Senate floor vested what amounted to all private energy pricing decisions in the hands of a newly strengthened independent Board. *See* S. 826, § 402, 123 Cong.Rec. 15,263 (1977). The Senators indicated that the new arrangement represented a political compromise worked out in committee. *See* 123 Cong.Rec. 15,278, 15,280, 15,281 (1977) (remarks of Sens. Jackson, Glenn & Javits). The House version of the bill, now redesignated H.R. 6804, emerged from committee relatively unscathed, *see* H.R. 6804, 123 Cong.Rec. 17,282 (1977), but quickly met a similar fate at the hands of Representative Moss during the floor debates. *See* 123 Cong.Rec. 17,302–10 (debate and adoption of the so-called Moss Amendment). When both Houses eventually agreed upon the Senate version, S. 826, Representative Moss expressed his satisfaction and remarked, "Under the language reported by the Conferees, the Federal Energy Regulatory Commission will exercise all but a very small portion of the functions now vested in the Federal Power Commission." 123 Cong. Rec. 26,119 (1977). *See* S.Rep. No. 367, 95th Cong., 1st Sess. 76 (1977) (second Conference Report) (listing some of the FPC powers not transferred to the FERC). The allocation of ratemaking power between the Secretary and the FERC thus represented a deliberate compromise, the result of the political balance of power during the first session of the ninety-fifth Congress.

The legislative history further indicates that the asserted discrepancy between the "transferred but not changed" theory as expressed in section 501(a)(1) and what the statute actually accomplishes was inadvertent. Congress intended this clause to apply to the *substance* of the technical procedural requirements, and not to the identity of the agencies responsible for implementing them. *See* H.R.Rep. No. 539, 95th Cong., 2d Sess. 81 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 925, 952. For example, if the Flood Control Act had required hearings on the record, the Secretary would have been forbidden from abolishing those adjudicative procedures. *Id.* At the same time, the weakening of consumer protection through the elimination of bifurcation was considered to be a necessary price to pay for improved administrative efficiency. The point is that Congress wished to avoid making any "substantive" changes in the law, and for their purposes "substantive" included hearing and other requirements that most lawyers in normal contexts would have termed procedural. *See id.*; 123 Cong.Rec. 17,264–65 (1977) (colloquy between Reps. Brooks & Eckhardt). Congress did recognize that the same theoretical protection could be worth a very great deal before an independent administrative agency like the Federal Power Commission and hardly anything before an officer of the executive department, *see Hearings on H.R. 4263, supra,* at 674 (questioning conducted

by Rep. Moss), but the result was the Moss compromise—which does not include federal hydroelectric power ratemaking.

Though it is not drafted as happily as it might have been, the political ratemaking compromise reached by the ninety-fifth Congress is adequately expressed in the statute and rationally explained in the legislative history. We therefore think that we are required to enforce it.

Like Tex-La, the government, and the court in Sam Rayburn Dam, supra, we realize that the provisions of the DOE Act apparently do partially conflict with one another. But unlike Tex-La, the government, and the court in Sam Rayburn Dam, we believe that the solution to the problem is not to act as though it did not exist, or to give effect to the "transferred but not changed" theory at the expense of the general provisions, the legislative history, and even common sense; rather, we believe that we are required to give effect to the statute's obvious purpose and operative provisions, even if we must do so at the expense of literal compliance with the "transferred but not changed" theory.

█ Because of the apparent contradiction in the statute, it is impossible for any court to give effect to every provision. We must make a choice. Being forced to do so, we have no trouble in doing what makes the most sense and what best carries out the clearly expressed intention of the legislature. Despite the implicit expression of the "transferred but not changed" theory in sections 301(b) and 501(a)(1) of the Act, we hold that the unification of the two Flood Control Act functions in the hands of the Secretary in effect amends section 5 of the Flood Control Act to alter the strict procedural requirement of a bifurcated rate implementation scheme.

This conclusion disposes of part of the case. The parties have conceded, as again they must,[15] that the 864 and 921 contracts should be read to reflect subsequent procedural statutory amendments. 524 F.Supp. at 419; 3 Record at 26, 32 (Case No. 81–3715). The two contracts track, and in effect incorporate by reference, the language of section 5 of the Flood Control Act. Since the procedural requirements of section 5 have been altered by the DOE Act, the two contracts should be read accordingly, i.e., as permitting the imposition of interim rates, subject to refund with interest, by the Secretary of Energy. As we shall now show, the only limitation on the Secretary's authority is that his procedures must carry out, insofar as possible, the directives of both applicable statutes.

## III. TRIFURCATION AND THE SECRETARY'S REGULATIONS.

In an attempt to reconcile the conflicting elements of the DOE Act, the Secretary of Energy has codified his December, 1978, delegation order and promulgated regula-

---

15. The constitutional prohibition against the enactment of ex post facto laws applies only to criminal statutes. See, e.g., Harisiades v. Shaughnessy, 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952). The obligations clause applies only to state enactments. See U.S.Const. art. I, § 10, cl. 1 ("No state shall ... pass any ... Law impairing the Obligation of Contracts."). Since a court must apply the law as it exists at the time of its decision, see, e.g., Bradley v. School Board, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), the only contractual or constitutional restriction that could apply to the DOE Act's effect on contracts written under the Flood Control Act would be the due process clause. See, e.g., Sinking Fund Cases, 99 U.S. 700, 718–19, 25 L.Ed. 496 (1879); Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 F.2d 1174, 1179 (2d Cir.1977) (effect of subsequently promulgated arbitration requirements on prior inconsistent contractual provision). See generally 1 J. McBride & T. Touhey, Government Contracts § 1.20[3] (1978 & Supp. 1982) (subsection entitled "Abrogation of Vested Rights"). This case does not involve the imposition of a rate increase where the contract forbade such increases; rather, the DOE Act merely instituted a slight procedural change in how the new rates were to go into effect. And as both parties concede, "interim" rates have always been lawfully imposed under the Flood Control Act as it was interpreted before the 1977 Act went into effect. See Part IV.A, infra. We do not address the question of whether Tex-La could have successfully challenged the rate of interest given, had it been necessary to return interim rate collections. Cf. 18 C.F.R. § 300.-20(c)(3) (1982) (level of interest rates for BPA interim rate refunds under the Bonneville Power Act and the Pacific Northwest Electric Power Planning and Conservation Act).

tions to preserve, as nearly as possible, the two-stage review process described in section 5 of the Flood Control Act of 1944. We think that he has done all that he reasonably could do to carry out his statutory mandate, and that his trifurcated rate-making procedures if anything err on the side of affording power customers too much procedural protection. And this, surely, is all that the two hydroelectric power contracts require.

The following analysis will focus on the administrative realities of federal hydroelectric ratemaking. Contemporaneous or near contemporaneous administrative practices often figure very importantly in the interpretation of an ambiguous statute. *See, e.g., E.I. du Pont de Nemours & Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234, 53 L.Ed.2d 100 (1977) (citing cases). In order to determine the purpose and practical effect of the bifurcated ratemaking mechanism, the key question then becomes *who* is required by *what* to give *how much* "process" *when.* In the years since the middle 1940s, when the PMAs and the Federal Power Commission first began working together, the answers to this question have changed dramatically.

#### A. Past Administrative Practice and Interpretation.

Until relatively recently, the several Power Marketing Administrations were not re-

quired to and did not afford their customers any kind of formal "process" at all. *See, e.g., United States Department of the Interior, Southeastern Power Administration, Docket No. E–7002,* 54 F.P.C. 3 (1975); *United States Department of the Interior, Bonneville Power Administration, Docket No. E–8978,* 52 F.P.C. 1912 (1974); *BPA, No. E–6611, supra,* 34 F.P.C. at 1462 (1965); *Southwestern Power Administration, Docket No. IT–5971,* 6 F.P.C. 407 (1947). Because there were no statutes, rules, or even unwritten practices or customs requiring hearings, power customers were entirely unprotected by any procedural safeguards in the initial stage of the ratemaking process. A customer was fortunate even to participate in informal, off-the-record discussions with the relevant PMA before a new rate schedule was submitted to the Commission for confirmation and approval. *See BPA, No. E–6611, supra,* 34 F.P.C. at 1464 (informal "conferences" held). There was not even the opportunity for the kind of "notice and comment" proceedings common in most ratemaking cases.

The second stage of the process—"confirmation and approval" from the Federal Power Commission—was therefore inordinately important. The Commission did give published notice and afford the opportunity for more formal oral hearings.[16] The Com-

---

16. To explain why it did so requires a short detour. Although most ratemaking is subject to the notice and comment provisions of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1976), the sale of public property, such as hydroelectric power, is specifically exempted. *See* APA § 4, 5 U.S.C. § 553(a)(2); *City of Santa Clara v. Andrus,* 572 F.2d 660, 673 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978); *Associated Electric Cooperative, Inc. v. Morton,* 507 F.2d 1167, 1177–78 (D.C.Cir.1974), *cert. denied,* 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975). The exemption, however, was designed not to discourage agencies from "adopt[ing] voluntary public rule making procedures where useful to the agency or beneficial to the public," but rather to leave the question of whether to adopt formal procedures entirely up to the agency's good judgment. S.Rep. No. 752, 79th Cong., 1st Sess. 199 (1945) (legislative history of the APA). The Federal Power Commission

accordingly adopted the practice, eventually codified in the Code of Federal Regulations, of holding not merely "notice and comment" proceedings, but full, adjudicatory hearings with cross-examination of witnesses. *See* 18 C.F.R. § 2.1(a)(1)(vi)(A) (1973) (superseded) (required publication of notice in the Federal Register, thereby invoking Commission's full "rules of practice"); *United States Department of the Interior, Bonneville Power Administration, Docket No. E–9563,* 58 F.P.C. 2498, 2500 (1977) (formal hearing ordered before ALJ, which, under 18 C.F.R. § 1.20(g)(1) (1977) (superseded), entails right of oral cross-examination of witnesses); *SEPA, No. E–7002, supra,* 54 F.P.C. at 3 (same, invoking 18 C.F.R. § 1.20 (superseded)); *BPA, No. E–8978, supra,* 52 F.P.C. at 1912–13 (same, invoking 18 C.F.R. § 1.20 (superseded)); *BPA, No. E–6611, supra,* 34 F.P.C. at 1465 ("presentations," presumably as that word is defined in 18 C.F.R. § 1.20(g)(1) (superseded), made before full Commission, and not

mission's dedication to the principle of full and public administrative hearings under the Bonneville Project Act and the Flood Control Act was unambiguous. "This Commission," according to one per curiam opinion, "believes that it is appropriate and in the public interest to discharge its duties and responsibilities under the Bonneville Project Act and the Flood Control Act of 1944 *on the basis of evidentiary records which are developed during the course of public hearings." United States Department of the Interior, Bonneville Power Administration, Docket No. E–8978,* 54 F.P.C. 808, 810 (1975) (emphasis added). The Commission's reviewing procedures under section 5 of the Flood Control Act and section 6 of the Bonneville Project Act were lengthy, careful, and designed to afford power customers every imaginable procedural safeguard.

The Federal Power Commission's substantive review was equally careful and painstaking. Although the New Deal image of the apolitical, expert, and therefore deservedly autonomous agency has long since been questioned, *see, e.g.,* DeLong, *Models of Regulation,* 80 Mich.L.Rev. 885, 886–89 (1982) (summarizing the literature); Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1669 (1975) (leading analysis), the Federal Power Commission did its best to fulfill the ideal. Its reviewing function under section 5 of the Flood Control Act and section 6 of the Bonneville Project Act did not in any way resemble the "hands off" kind of review often undertaken by courts of appeals. When urged to adopt this limited reviewing function, the Commission expressly rejected it and commented:

> Our jurisdiction ["within the framework of the Bonneville Act and the Flood Control Act"] . . . can neither be analogized to an independent rate investigation [under the Federal Power Act] *nor to the appellate function of United States Courts of Appeals* over Commission decisions under the Federal Power Act. It

evolves from a unique relationship between the Department of the Interior, a part of the Executive Branch, with managerial and ratemaking expertise over its projects, and, the Federal Power Commission, an independent agency of the Congress with special expertise in ratemaking. In establishing this relationship Congress did not limit us to the function of assuring that the Secretary had complied with the bare legal requirements of the statute[s]. It expected us to apply our independent expertise in evaluating the rates set by the Secretary.

*BPA, No. E–6611, supra,* 34 F.P.C. at 1465 (emphasis added). *See United States Department of the Interior, Southwestern Power Administration, Docket No. E–6943,* 56 F.P.C. 795, 802 (1976) (same); *BPA, No. 8978, supra,* 54 F.P.C. at 811 (same). Aided by full adjudicatory proceedings, and backed by a staff with special expertise in ratemaking, the Commission understood that it was required to undertake a substantive inquiry into the nuts and bolts of the federal hydroelectric power ratemaking process. The Commission's review under section 5 of the Flood Control Act and section 6 of the Bonneville Project Act was therefore both procedurally and substantively exhaustive.

*B. Present Administrative Practice and Interpretation.*

The situation today is completely different. The "confirmation and approval" function, now exercised by the FERC, is considerably less than what it once was; conversely, the full panoply of procedural protections afforded complainants before the several PMAs in some ways rivals even what the old Federal Power Commission used to do.

The self-imposed limitations of the FERC on its reviewing authority under section 5 of the Flood Control Act and section 6 of the Bonneville Project Act have been formally set out and explained in three recent

---

just ALJ); *but cf. SWPA, No. IT–5971, supra,* 6 F.P.C. at 408 (full hearing not granted because rates approved were only "temporary," and were to go into effect on an "interim basis" only).

opinions. In the first case to arise under either act after the passage of the DOE Act, the FERC said, "The Commission emphasizes that its role here is in the nature of an appellate body." *BPA, No. EF80–2011, supra,* 45 Fed.Reg. at 79,547. This is exactly the opposite of what the Federal Power Commission had said in the long passage just quoted. *BPA, No. E–6611, supra,* 34 F.P.C. at 1465. The justification for the about-face appears to be that, with the improvement in the procedures before the PMAs, extensive appellate proceedings are no longer cost-justified. *See United States Secretary of the Interior, Bonneville Power Administration, Docket No. E–9563,* 45 Fed. Reg. 80,882, 80,883 (FERC 1980).[17] *See also SWPA, No. EF79–4011, supra,* 46 Fed.Reg. at 30,878 (case at bar) (citing Nos. EF80–2011 & E–9563, *supra,* as controlling).

The recent procedural developments within the PMAs have indeed been dramatic.[18] Although SWPA has always "follow[ed] an informal practice on a case-by-case basis" according to no particular rules, 45 Fed.Reg. 86,976, 86,976 (1980) (description of prior procedural practices), formal rules were recently tested (as in the case at bar) and officially promulgated at the end of 1980. *See* 10 C.F.R. § 903 (1982). The rules require extensive public hearings, beginning with "public information forums," 10 C.F.R. § 903.15, and culminating with non-adjudicative "public comment forums,"

10 C.F.R. § 903.16. Although not adjudicative hearings in the sense of section 1.20 of the old Federal Power Commission's rules, of practice, *see* 18 C.F.R. § 1.20 (1977) (superseded), the new public hearings nevertheless seem to provide all that could be desired in the way of procedural protection.[19]

The substantive quality of the new "interim rate" intermediate review by the Assistant Secretary also seems to be more than adequate. Although things may change with time, we have been given no reason to suspect at this juncture that his review is a mere sham or rubber stamp. He depends procedurally, of course, on the record made in the public proceedings before the relevant PMA, but his judgment as a higher ranking officer in the Department of Energy than the regional PMA administrator remains independent.[20] Still, the Assistant Secretary and the PMA administrator remain answerable to one person, the Secretary of Energy, and are hence at least in that sense not as independent from each other as was the Federal Power Commission (answerable to Congress) from the Secretary of the Interior (answerable to the President). One could therefore reasonably claim that the current interim rate review has somehow lost the true independence present in the old system.

17. This case, *BPA, No. E–9563,* was actually decided under section 9 of the Federal Columbia River Transmission System Act, 16 U.S.C. § 838g (1976 & Supp. IV 1980), which provides that rates "shall become effective upon confirmation and approval thereof by the Federal Power Commission." This section of the Act copies section 6 of the Bonneville Project Act and was intended to place in effect precisely the same scheme, governed by precisely the same legal standards. *See* H.R.Rep. No. 1375, 93d Cong., 2d Sess. 5 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 5810, 5814 (1974) (section 9 "preserves the existing requirement of law that rate schedules prepared by BPA must be approved by the Federal Power Commission before they become effective").

18. This discussion does not include the Bonneville Power Administration, which had peculiar procedural rules imposed upon it by statute in 1980. *See* Part IV.B, *infra.*

19. The parties essentially agree on this point, as it seems they must after *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (procedural dictates of the APA control). Note that the provision exempting federal hydroelectric power ratemaking from *all* of the procedural requirements of the APA has been expressly overridden. *See* note 12, *supra.*

20. Although counsel for the government has asserted that the reduction from a 42 percent to a 33 percent rate increase was made by the Assistant Secretary, our reading of the printed record indicates that it was SWPA itself that made the reduction, not the Assistant Secretary. *See Appropriation Hearings, supra* Part I.B, at 2997 (indirect statement to that effect); *SWPA, Order SWPA–1, supra,* 44 Fed.Reg. at 13,069 (same).

We think, however, that whatever lingering doubts that might exist about the substantive adequacy of the Assistant Secretary's review are resolved by the provision for a final administrative review before the FERC. In this case justice delayed is most definitely not justice denied. Rates are very carefully reviewed by the PMA itself after the various public proceedings and by the Assistant Secretary before rates go into effect at all. Then, if the FERC nevertheless determines that certain of the rates are unjustifiably high, the overcharges are returned with interest.[21] Given both the considerable confusion in the DOE Act about the continued existence of the bifurcated procedures of the Flood Control Act and the uncertainties of the modern American economy, the Secretary seems to have gone to considerable lengths to devise regulations that would keep rates current in as fair a way as possible.

This analysis leads us to conclude that the first two stages in the trifurcated procedures set out in section 903 of the Secretary of Energy's regulations—which must be fully complied with before rates go into effect even on an interim basis—fully meet the "process" concerns of those who originally designed and enacted the bifurcated ratemaking procedure set out in section 5 of the Flood Control Act. Correlatively, we do not think that the somewhat minimal benefits conferred by the FERC's new watered-down review procedures, especially when weighed against the substantial cost to the government of delay, are worth what in the present case was a twenty-seven month wait. (Any excessive charges are not absconded with, but are returned *with interest*.) We similarly believe that the present procedures more than meet the "excessive rate" concerns of those who, using the Flood Control Act's language as a model, drafted the 864 and the 921 contracts at issue in this case. Any other conclusion would require us to shut our eyes to the administrative realities—which we refuse to do. The Secretary's current interim rate

implementing procedures are sound in policy and do as much as anyone could reasonably expect in reconciling the conflicting textual demands of the Flood Control and DOE Acts.

## IV. CONGRESSIONAL RATIFICATION AND THE PROBLEM OF "INTERIM" RATES.

The parties have raised three subsidiary arguments that remain to be addressed. All of them concern the "interim" nature of the present rates. Although we think that the parties have made much ado about relatively little, the arguments nevertheless deserve a careful treatment, first, because their consideration has, in part, led us to the result we reach today, and second, because they have been accepted by some courts.

### A. The Four FPC Interim Rate Cases.

As both parties point out, the Federal Power Commission before it was abolished issued at least four "interim" rate orders under section 5 of the Flood Control Act and section 6 of the Bonneville Project Act. *United States Department of the Interior, Bonneville Power Administration, Docket No. E–9563,* 58 F.P.C. 2498 (1977); *SEPA, No. E–7002, supra,* 54 F.P.C. at 3; *BPA, No. E–8978, supra,* 52 F.P.C. at 1912; *SWPA, No. IT–5971, supra,* 6 F.P.C. at 407. Although these cases do show that the Federal Power Commission recognized the usefulness and legality of interim rates, they shed relatively little light on the present case.

Once the Secretary of the Interior developed rates and submitted them to the Commission for approval, the Commission had what amounted to plenary rate implementation authority. Since the Commission was under no legal obligation to hold any kind of hearings whatsoever, *see* note 16 *supra,* it clearly had the inherent administrative authority to implement interim rates virtually immediately. The Supreme

---

**21.** The rate of interest is not specified, but the BPA, which now has separate and peculiar regulations of its own, gives its overcharged customers the same rate of interest that it itself must pay when it borrows. *See* 18 C.F.R. § 300.20(c)(3) (1982).

Court has upheld this kind of ratemaking authority on a number of occasions. *See Federal Power Commission v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962) (holding that once there is plenary rate implementation authority, there must necessarily also be implied interim authority); *Federal Power Commission v. Natural Gas Pipeline Co.,* 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942) (same); *The New England Divisions Case,* 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605 (1923) (same, leading case). Neither the Bonneville Project Act nor the Flood Control Act imposed a requirement that implemented rates be somehow "final." Tex-La and the government have each conceded that dicta in two recent lower court decisions to the contrary is simply mistaken, and we agree. *City of Fulton, supra,* 680 F.2d at 120–21; *Sam Rayburn Dam, supra.* The Federal Power Commission had final and plenary authority over rate implementation. A fortiori, under *Tennessee Gas* it could use only part of that authority and approve rates for an interim period. *See also* S.Rep. No. 272, 96th Cong., 1st Sess. 31 (1979) ("The Committee recognizes that prior to the Department of Energy Organization Act, the Federal Power Commission exercised interim rate approval authority with respect to the Administrator's rates.").

22. Tex-La also argues that the Assistant Secretary's interim rate approval was somehow not "final" within the meaning of both the Flood Control Act and the two hydroelectric power contracts. Given the passage of the DOE Act, the "final" requirement of the Flood Control Act is, in essence, a false issue and has been disposed of in Part II, *supra.*

The use of the word "final" in one of the power contracts is more problematical. Tex-La assumes without argument that the word should be interpreted according to its usual meaning in the judicial review of agency action cases, i.e., that "final" somehow embraces either the notion of administrative exhaustion or that of an unmodifiable order. Under this interpretation, rates could not be raised until such "final" administrative action has occurred—confirmation by the FERC. Again, we think that the 921 (as well as the 864) contract was written to do nothing more than track the language of section 5 of the Flood Control Act, which has been amended by the DOE Act.

The issue in the present case is not whether interim rate authority exists but rather, given that it exists, who shall exercise it under the DOE Act. Tex-La's argument that interim rate authority must be exercised by the same administrative body as that which has the final authority is predicated upon the false assumption that the DOE Act did not modify the bifurcated procedure of the Flood Control Act.[22] We have explained our reasons for rejecting this assumption in the first three Parts of this opinion.

### B. Congressional Ratification of the Delegation Order.

In 1980 Congress in effect modified section 6 of the Bonneville Project Act by enacting the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839 to 839h (Supp. IV 1980) ("Pacific Power Act"). In so doing, it considered and partly rejected the Secretary of Energy's trifurcated ratemaking procedures. The parties vigorously urge that these recent congressional deliberations should influence our decision today but— quite apart from the somewhat dubious propriety of relying upon this kind of post hoc "legislative history"—we have found the deliberations neither very helpful nor applicable to the present case. The deliberations do, however, highlight some of the policy

We do not, in any event, think that the draftsmen had in mind anything like the "exhaustion" requirements that a court must consider in reviewing action taken by an administrative agency; we similarly do not think that they were concerned with the question of possible mootness that troubles a court when it reviews an administrative order that is still subject to modification. Even without the DOE Act's changes in the Flood Control Act, the various administrative review or "finality" cases that Tex-La cites would be inapposite. *See, e.g., McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (finality in sense of administrative exhaustion); *Glidden Co. v. Zdanok,* 370 U.S. 530, 554, 82 S.Ct. 1459, 1474–75, 8 L.Ed.2d 671 (1962) (finality in sense of non-modifiability required in order to avoid possibility of rendering advisory opinion).

problems involved in federal hydroelectric power interim ratemaking, and we have carefully considered them before reaching our decision today.

As enacted after considerable debate, section 7(i)(6) of the Pacific Power Act, 16 U.S.C. § 839e(i)(6), gives the Act's interim rate authority to the FERC, which was required to issue regulations for that purpose within one year. *See* 18 C.F.R. § 300 (1982). In order to fill the contemplated one-year gap before the FERC could promulgate its interim rate regulations, section 7(i)(6) also authorized the Secretary of Energy "to approve such interim rates during such one-year period in accordance with the applicable procedures followed by the Secretary prior to the effective date of this Act." Pacific Power Act § 7(i)(6), 16 U.S.C. § 839e(i)(6). The Secretary's one-year authority, and its ultimate vesting in the hands of the FERC, is significant for two reasons.

First, Congress clearly understood and approved of the Secretary's exercise of the interim ratemaking function under his December, 1978 delegation order. As the Chairman of the House Energy and Commerce Committee explained to his colleagues on the House floor, the Act "authorizes the Secretary of Energy to approve . . . rates on an interim basis during [the] 1-year period in accordance with the applicable procedure followed by the Secretary at the present time for such interim approvals." 126 Cong.Rec. H10685 (daily ed. Nov. 17, 1980) (remarks of Rep. Dingell). *See also* 126 Cong.Rec. H9854 (daily ed. Sept. 29, 1980) (remarks of one of the principal sponsors, Rep. Swift) ("[T]he Secretary of Energy may, as he does today, grant . . . interim approval . . . ."). It is therefore indisputable that the ninety-sixth Congress—which was only one Congress removed from the ninety-fifth that passed the DOE Act—fully recognized at least the bare legality of the Secretary's trifurcated ratemaking procedures.

The second important point, as Tex-La has correctly observed, is that even though the ninety-sixth Congress thought that the Secretary's December, 1978 trifurcation order was legal, it also thought that its interim ratemaking procedure was unwise. The original bill as recommended by the Senate, S. 885, 96th Cong., 1st Sess. § 7(a), S.Rep. No. 272, 96th Cong., 1st Sess. 9 (1979), and considered by the House, S. 885, 96th Cong., 2d Sess. § 7(i)(6), H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. 1, at 19 (1980), vested interim ratemaking authority *entirely* in the FERC. The rationale seems to have been the same as that advanced over forty years earlier by Secretary Ickes's original National Power Policy Committee: rates should not go into effect until "after substantive review" by an independent agency. H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. 1, at 81 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 5989, 6017 (minority committeemen expressing satisfaction with this aspect of the bill). The Secretary's vigorous defense of his already existing interim rate implementation procedures was to no avail, Letter from the Department of Energy to the House Subcommittee on Water and Power (March 11, 1980), *reprinted in* H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. 2, at 60–63 (1980), *and in* 1980 U.S.Code Cong. & Ad.News 6058–61, and resulted only in the eventual ratification of his existing procedures for the temporary interval after the effective date of the Act and before promulgation of regulations by the FERC. *See* S. 885, 96th Cong., 2d Sess. § 7(i)(6), H.R.Rep. No. 976, 96th Cong., 2d Sess., pt. 2, at 20 (1980) (this is still a third version of the bill S. 885; the enacted language tracked yet a fourth version that imposed the one-year time limit for the FERC to promulgate its regulations).

The Pacific Power Act, in short, has created a deliberate difference between the Bonneville Power Administration's rate implementation procedures and those of the other four PMAs. (The BPA is also now required to permit some oral cross-examination during its public hearings.) In changing the status quo for the BPA, Congress appears to have shown no marked unhappiness with what is going on in the other four PMAs. If anything, we think that this supports the result that we have reached.

## C. Implied Rate Implementation Authority.

The parties, finally, have vigorously argued about the effect of the DOE Act's boiler-plate "necessary and proper" clause, DOE Act § 644, 42 U.S.C. § 7254, and about the DOE Act's incorporation by reference of the Natural Gas Act's similar boiler-plate "necessary and proper" clause, DOE Act §§ 302(b), 402(a)(2), 42 U.S.C. §§ 7151(b), 7172(a)(2). *See* Natural Gas Act of 1938, § 16, 15 U.S.C. § 717*o* (1976 & Supp. IV 1980). *See also* Federal Power Act of 1935, § 309, 16 U.S.C. § 825h (1976 & Supp. IV 1980) (same kind of provision, also incorporated by reference into the DOE Act). The problem arises because the Supreme Court has definitively held that this kind of clause, and section 16 of the Natural Gas Act in particular, contains an implied authority to issue interim rate orders. *See, e.g., Federal Power Commission v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962).

We reject the above arguments for the Secretary's exercise of an interim rate authority essentially for the same reasons that the court below rejected them. The Natural Gas Act, like most modern ratemaking statutes, provides for a plenary ratemaking authority and vests in it one body, there, the Federal Power Commission. As the Supreme Court held in *Tennessee Gas,* an interim authority follows naturally from a plenary authority under the usual "necessary and proper" clause. What the government has failed to understand in urging upon us a similar argument in the present case is that such a holding necessarily depends upon the existence of a plenary authority. In this case the rate developer has none; the scheme set out in section 5 of the Flood Control Act of 1944 *divides* rate authority and vests it in two separate branches of the government. The government's suggested approach assumes the validity of the conclusion even before the process of deduction has begun. *But see Montana Power Co. v. Edwards,* 531 F.Supp. 8 (D.Or. 1981) (adopting the approach attacked in this paragraph); *Pacific Power & Light Co. v. Duncan,* 499 F.Supp. 672 (D.Or.1980)

(same); *but cf. Colorado River Energy Distributors Ass'n v. Lewis,* 516 F.Supp. 926 (D.D.C.1981) (correctly relying on *Tennessee Gas* in hydroelectric ratemaking case under section 9(c) of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(c) (1976), which gives the Secretary plenary authority). To resolve this case, we are forced to examine the substantive provisions of the Flood Control and DOE Acts, which we have done in the first three Parts of this opinion.

## V. CONCLUSION.

The various provisions of the two acts do seem to conflict with one another. Those responsible for the design of the scheme embodied in section 5 of the Flood Control Act of 1944—Secretary of the Interior Harold Ickes's National Power Policy Committee of 1937—originally placed the rate development and rate approval functions in separate hands in order to guarantee that rates would be "appropriately . . . checked and audited by a national agency in the light of national policy." *Hearings on H.R. 7642, supra,* at 144. While in effect stating that these two functions were transferred but not changed, DOE Act §§ 302(b), 501(a)(1), the Department of Energy Organization Act also transferred both functions to the Secretary of Energy alone. Some change, we submit, is therefore unavoidable. The architects of the bifurcated scheme in section 5 of the Flood Control Act (and in section 6 of the Bonneville Project Act) presumably did not intend that rate development and the requisitely independent "check and audit" could both be done by one man, or even one department. Thus, the conflict between the provisions in the DOE Act is patent, and must be forthrightly addressed.

We think that the Secretary of Energy, through his delegation order of December, 1978, has resolved the conflict in the statute as best he reasonably could. He has delegated rate development to the local Power Marketing Administrations, rate approval and interim implementation to his own Assistant Secretary, and final approval to the

independent agency, the FERC. This trifurcated arrangement does as much as possible to resolve the Flood Control Act's command that there be an *independent* check on ratemaking, and the DOE Act's command that ratemaking be made more efficient through the centralization of control in one officer, the Secretary of Energy.

The two hydroelectric power marketing contracts in this case each track the language of the Flood Control Act and therefore also contemplate that its bifurcated procedures will be used when rates are raised. The DOE Act has slightly altered this statutory procedure, but since the parties have conceded that the contracts should be read to incorporate subsequent statutory alterations,[23] we hold that the Secretary of Energy is entitled to use the new trifurcated procedures in raising rates under the two contracts.

We wish to underscore, finally, that a conclusion contrary to the one that we have reached today would be difficult to justify on almost any terms except the most literal. A contrary conclusion would mean that the DOE Act's unification of the rate development and rate confirmation functions in the Secretary of Energy would have produced, after the trifurcation of the delegation order, a most unlikely result: the Secretary's current trifurcated scheme would have been struck down because it gave litigants *too much* "process" by giving them one last, truly independent review before the FERC. (No one disputes that before the delegation order the whole ratemaking authority could have been exercised by the Secretary or an Assistant Secretary alone.) Whatever the role of common sense in interpreting the oftentimes somewhat mystifying pronouncements of the legislature, we think that at the very least it requires searching study and careful consideration before we strike down a scheme that gives the complainants *too much* process. Such a result is, in any event, unnecessary here and we reject it absolutely.

REVERSED.

23. *See* note 15, *supra,* and accompanying text.